Submitted on record and briefs November 25, 1997, reversed April 29, 1998

OREGON DRYWALL SYSTEMS, INC.,
*Petitioner,*

*v.*

The filings of the
NATIONAL COUNCIL ON
COMPENSATION INSURANCE,
*Respondent below,*

*and*

SAIF CORPORATION,
*Respondent.*

(INS 95-02-006; CA A96891)

958 P2d 195

Janice C. Goldberg and Hershner, Hunter, Andrews, Neill & Smith, LLP filed the brief for petitioner.

Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General, filed the brief for respondent.

Before De Muniz, Presiding Judge, and Deits,* Chief Judge, and Haselton, Judge.

DE MUNIZ, P. J.

---

* Deits, C. J., *vice* Rossman, S. J.

## DE MUNIZ, P. J.

Oregon Drywall Systems, Inc., (Oregon Drywall) seeks judicial review of a final order of the Insurance Division of the Department of Consumer and Business Services (DCBS) upholding premium audit billings for audit periods January 1, 1992, through December 31, 1993, and January 1, 1994, through December 31, 1994, performed by SAIF Corporation. We conclude that DCBS erred in holding that drywall subcontractors who perform services for Oregon Drywall are workers under the Workers' Compensation Law and reverse.

Oregon Drywall is a drywall contractor for residential and commercial buildings. It is also licensed as a general contractor for the building of homes and other structures, for which it performs the drywall work and subcontracts out other work. Oregon Drywall has employees who do drywall work, including hanging and finishing. If a general contractor has more drywall work than Oregon Drywall can do with its own employees, it contracts with drywall subcontractors. During the relevant audit periods, Oregon Drywall contracted with approximately 18 different drywall subcontractors.

At the relevant time, SAIF Corporation provided workers' compensation insurance coverage to Oregon Drywall. To determine an appropriate workers' compensation premium rate, SAIF uses the business classifications and rates of the National Council on Compensation Insurance (NCCI), a licensed rating organization for workers' compensation insurance. NCCI's classifications and rates have been filed with and approved by DCBS. In its audit of the periods in question, SAIF determined that the drywall subcontractors were actually employees of Oregon Drywall and, as a result of the audit, billed Oregon Drywall for premiums owed for each of the audit periods. Oregon Drywall seeks review of an order of DCBS upholding the results of the premium audit.

William Peterman, the sole shareholder and operator of Oregon Drywall, testified generally concerning the relationship of Oregon Drywall with the subcontractors. He

testified that he prefers to use Oregon Drywall employees on a job to save the additional cost of a subcontractor but that he will hire subcontractors as necessary to meet the needs of the general contractor. Initially, subcontractors contact Peterman to let him know that they are available to do subcontract work. Peterman then contacts the subcontractors when he has more work than Oregon Drywall employees can complete within the time requirements of the general contractor.

During the relevant time, there usually was no written contract between Oregon Drywall and the subcontractor. Subcontractors would bid on a project by the square foot or by the hour if square footage was not a reasonable means of payment because of the nature of the job. The payment method was at the discretion of the subcontractor. Subcontractors would bill Oregon Drywall on completion of the job and would be paid 30 days from the completion date, usually by the 10th of the following month. Peterman testified that he generally did not question a subcontractor's bid or a billing and that he placed his trust in the subcontractors to bill him fairly.

Peterman testified that he would not presume to tell the subcontractors how to do their work, as he regarded them as equals, with the same training, licensing and ability to bid for any job for which Oregon Drywall bids. He testified that all subcontractors had their own businesses, were separately bonded and registered with the Construction Contractors Board and carried their own liability insurance. The subcontractors were free to hire their own workers if their licensing permitted it. They frequently worked with other subcontractors on jobs and split the fees. Oregon Drywall had no interest or concern in any arrangement subcontractors might make to work with others.

Within the time frame established by the general contractor, subcontractors could set their own hours and days of work. They could decline to take a job with no adverse consequence. Most subcontractors worked for other contractors as well. Peterman testified that subcontractor jobs were generally separate from jobs for which Oregon Drywall used employees. Oregon Drywall usually supplied the drywall material, tape and mud. Subcontractors supplied their own

tools and equipment, mostly hand tools, ladders and scaffolding. Oregon Drywall would visit sites to determine work progress and to inspect the work on completion but would not tell a subcontractor how to do the work. Oregon Drywall had the right not to contract with any subcontractor. Peterman testified that he once replaced a subcontractor who did not show up for a job.

■ *S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 872 P2d 1 (1994), sets forth the method for determining whether an individual is a person entitled to benefits under the Workers' Compensation Law. First, it must be determined whether the individual is a "worker" as defined in ORS 656.005(30). If the person is a worker, then a determination must be made as to whether the person is a *subject* worker under ORS 656.023 or a nonsubject worker under ORS 656.027. As defined in ORS 656.005(30), a worker is a person who engages to furnish services for remuneration, "subject to the direction and control of an employer." It is the right to control, not actual control, that is dispositive. *Id.* at 622. Factors involved in determining the right to control include: (1) direct evidence of a right to control; (2) furnishing of tools and equipment; (3) the method of payment; and (4) the right to discharge without liability. *Id.* If the right to control factors are inconclusive, then it is appropriate to consider the "relative nature of the work" test, which considers such factors as whether the work is a regular part of the employer's business, whether the work is continuous or intermittent and whether its duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of a particular job. *Woody v. Waibel*, 276 Or 189, 192 n 3, 554 P2d 492 (1976) (quoting 1A Larson, *Workmen's Compensation Law* § 43.51 (1973)).

■ The question of worker status for purposes of the Workers' Compensation Law is one of law if the basic facts are not in dispute. The employer has the burden of disproving SAIF's determination as to who is a worker. *Salem Decorating v. Natl. Council on Comp. Ins.*, 116 Or App 166, 170, 840 P2d 739 (1992), *rev den* 315 Or 643 (1993). We review the findings of DCBS for substantial evidence and to determine whether its conclusion is correct as a matter of law. *Id.* at 171.

Nine subcontractors testified at the hearing. With regard to those who testified, the hearings officer determined that the "right to control" test did not conclusively show that they were workers, but that under the "nature of the work" test they were workers, because the work that they performed was a regular, integral and continuing part of Oregon Drywall's business. The evidence concerning those subcontractors who did not testify was the general testimony of Peterman concerning his relationship with the subcontractors and the documentation contained in the audit report. With respect to those nine, the hearings officer concluded that Oregon Drywall had failed to meet its burden to show that they were not workers under ORS 656.005.

■■ We have reviewed the record with regard to all 18 subcontractors, and, contrary to the conclusions of the hearings officer, we do not find the record on these undisputed facts to be inconclusive as to the right to control. All direct evidence of a right to control shows that the relationship of Oregon Drywall and its subcontractors was not one of employment: subcontractors could accept or refuse a job; they could set their own hours within the time frame of the general contractor; they could use their own methods to reach the intended result; and they were not subject to monitoring in the method of doing their work, but only in their progress. The right to control the work refers to the right to control the manner and means of accomplishing the result, not the right to control the details of the desired result. *Reforestation General v. Natl. Council on Comp. Ins.*, 127 Or App 153, 167, 872 P2d 423 (1994). As we held in *Cy Investment, Inc. v. Natl. Council on Comp. Ins.*, 128 Or App 579, 583, 876 P2d 805 (1994), the monitoring of progress toward job completion does not amount to the exercise of direction and control over the means and method of doing the work. The testimony of Peterman and the subcontractors indicates that in drywalling there are many acceptable methods and techniques for reaching the same desired result and that subcontractors were not instructed as to the details of how to complete the job. *Compare HDG Enterprises v. Natl. Council on Comp. Ins.*, 121 Or App 513, 518-19, 856 P2d 1037 (1993) (carpet installers were provided with suggested positions for seams and other details of installation). We conclude that the evidence shows

that Oregon Drywall had no right to control the methods chosen by the subcontractors.

■ The method of payment also indicates a nonemployment relationship. Subcontractors submitted bids and billings based on square footage or hours, depending on *their own* assessment of the job, its difficulty and the time involved. Oregon Drywall did not dispute billings and did not question bids that were within the range of acceptable charges for the nature and size of the job. Subcontractors were paid for each job within 30 days of completion, rather than by a regular pay schedule, also indicating that the relationship was not one of employment.

The record shows that drywall installers used their own tools for their work whether they were employed by someone else or self-employed. Thus, although it might otherwise be indicative of a nonemployment relationship, the furnishing of tools factor does not weigh on either side of the equation.

■ With regard to the right to terminate, the record shows that, although Oregon Drywall could choose not to enter into a new contract with a particular drywaller without liability to the subcontractor, the termination of a subcontractor mid-job without good reason would be regarded by all parties as a breach of contract. As we said in *Henn v. SAIF*, 60 Or App 587, 592-93, 654 P2d 1129 (1982), *rev den* 294 Or 536 (1983),

> "An unqualified right to fire, indicative of an employer-employe[e] relationship, must be distinguished from the right to terminate the contract of an independent contractor for bona fide reasons of dissatisfaction. The exercise of such a right is still consistent with the idea that a satisfactory end result is all that is aimed for by the contract." (Citations omitted.)

The fact that a party could terminate a contract only for bona fide reasons of dissatisfaction is indicative, in this circumstance, that the relationship is other than one of employment.

Because the factors relevant to the right to control test show conclusively that there was no employment relationship between Oregon Drywall and its subcontractors, we do not reach the relative nature of the work test and conclude that the subcontractors were not workers for purposes of the Workers' Compensation Act. *Reforestation General,* 127 Or App at 169; *Premsingh & Assoc. v. Natl. Council on Comp. Ins.,* 111 Or App 624, 627, 826 P2d 120, *rev den* 313 Or 300 (1992). For this reason, we need not consider the parties' arguments concerning the applicability of a 1995 legislative amendment to ORS 656.027(7) that establishes conclusively that contractors registered with the Construction Contractors Board are nonsubject workers. Or Laws 1995, ch 216, § 3(7)(b).

Reversed.