Argued and submitted May 15, affirmed September 2, petitioner's petition for reconsideration filed September 16 allowed by opinion November 4, 1998
See 157 Or App 125, 966 P2d 830 (1998)

In the Matter of the Petition of

Wayne E. COGHILL,
dba Allstate Siding Supply Co.,
*Petitioner,*

*v.*

The filings of the
NATIONAL COUNCIL ON
COMPENSATION INSURANCE,
*Respondent below,*

*and*

SAIF CORPORATION,
*Respondent.*

(INS 93-09-026; CA A96550)

964 P2d 1085

Charles M. Fryer argued the cause and filed the brief for petitioner.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, Armstrong, Judge, and Warden, Senior Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

Petitioner seeks review of a final order of the Insurance Division of the Department of Consumer and Business Services (DCBS) upholding premium audit billings by SAIF for the period between April 1, 1992, and March 31, 1993.[1] We review for errors of law, ORS 183.482(8)(a), and affirm.

The following relevant facts were found by an administrative law judge (ALJ) and adopted by DCBS.[2] Petitioner contracts to sell and install vinyl, steel, aluminum and wood siding, usually to builders of new buildings. After petitioner has contracted with a customer to sell and install siding, petitioner assigns a siding installer to the job. Petitioner either assigns the job to an employee or enters into a contract with a person whom petitioner considers to be an independent contractor.

During the audit period, petitioner relied on seven installers for various jobs.[3] Petitioner would describe the job to the installers, including the siding, size and other relevant factors. The installers usually accepted the jobs. The installers and petitioner would then prepare a contract for the job, signed by petitioner. The contract had petitioner's name on it and told the installer the customer's address and telephone number, the customer's color preference, and the materials to be used on the job.

Petitioner sometimes assigned employees to install less technical jobs. He also hired some of the outside installers as employees if he wanted to exercise more control over a particular job. He made the decision about whether to use employees or installers on a job based on the circumstances of each job, sometimes after the job had begun. Both employees

---

[1] In a companion case, *Coghill v. Natl. Council on Comp. Ins. (A96551)*, 155 Or App 638, 964 P2d 1090 (1998), petitioner challenges audit billings for the period from April 1, 1993, to March 31, 1994.

[2] In his summary of argument, petitioner states that the conclusion by DCBS that he was required to pay workers' compensation premiums was not supported by substantial evidence. He does not identify any DCBS findings that he considers to be erroneous but, rather, devotes the body of his argument to points of law. In that light, we conclude that petitioner has not challenged DCBS's findings.

[3] For purposes of this opinion, we will use the term "installers" to refer to those individuals considered by petitioner not to be employees.

and installers were paid by the square foot. Employees were paid 55 cents per square foot and installers were paid 75 cents per square foot. The installers were paid more to cover their expenses.

The installers were responsible for picking up the siding provided by petitioner and taking it to the job site. They were responsible for providing their own tools, ladders and transportation for any job, although petitioner sometimes would provide special equipment for the installers to use.

Petitioner occasionally inspected job sites, especially if he had assigned employees to the site. On some jobs, he assigned more than one contract installer. A sales representative of petitioner, Paul Phillips, would also visit work sites to promote customer relations and to report any sloppy work to petitioner. Sloppy work occurred in about one percent of the jobs. Petitioner was responsible to the customer for one year for any poor workmanship or products. Installers were liable to petitioner for one year for poor workmanship.

Installers were free to install the siding in any manner, although standard jobs were usually done in the same manner and did not require a high degree of skill. Installers set their own work hours. Petitioner mainly hired installers who were skilled and who could do the work promptly.

All the installers were bonded and registered with the state Construction Contractors Board (CCB) and filed business tax forms for their businesses. If an installer refused to correct poor workmanship, petitioner had the right to seek remedial action through the CCB against the installer's bond and registration. Both petitioner and installers could refuse to accept future jobs.

Petitioner required installers to sign a "Declaration of Independent Contractor Status." The declaration stated that the installer was an independent contractor who would work without the assistance of others unless the installer gave petitioner seven days' notice of the hiring of an assistant and provided workers' compensation coverage for the assistant. The declaration also stated that the parties understood

that installers would not be eligible to receive workers' compensation from employer.

At various times during the audit period, some installers told Occupational Safety and Health Administration (OSHA) inspectors that they were working for petitioner. On January 25, 1993, Gus Waltersdorf told an OSHA inspector that he was working as a foreman for petitioner, with a crew that included Rod Hall. Rod Hall told the inspector that he had been working for petitioner for five years. Petitioner did not report either Waltersdorf or Hall on its payroll reports to the Employment Department. On March 25, 1993, Doug Miller told an OSHA inspector that he worked for petitioner. Petitioner did not report Miller's payroll to the Employment Department. On September 2, 1992, the general contractor at a construction site told an OSHA inspector that Vern West was the foreman for petitioner for the siding work on that job. West told the inspector that he worked for petitioner and that petitioner was his supervisor. The inspector called petitioner and petitioner did not deny that West was his employee. Petitioner was assessed a fine because West was not using a safety belt while on a lift. Petitioner paid the fine and was not reimbursed by the installer. Petitioner required installers to comply with Oregon workers' safety laws. SAIF included all seven of petitioner's installers as workers in its premium audit of petitioner's workers' compensation coverage.

In order to determine whether an individual is a subject worker entitled to benefits under the Workers' Compensation Law, we first must determine whether that individual is a "worker." *S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 622, 872 P2d 1 (1994).[4] "Worker" is defined by ORS 656.005(30),[5] which provides, in pertinent part:

---

[4] Neither party has argued, and therefore we do not address, whether the 1995 amendment to ORS 656.027(7) that establishes conclusively that contractors registered with the CCB are not workers who are subject to the Workers' Compensation Law, Or Laws 1995, ch 216, § 3(7)(b), applies to this case.

[5] At the time this proceeding began, "worker" was defined by ORS 656.005(28). That subsection was renumbered in 1995, and is now ORS 656.005(30). Or Laws 1995, ch 332, § 1. The text was unaltered. We refer to the statute in its current form.

" 'Worker' means any person * * * who engages to furnish services for a remuneration, *subject to the direction and control of an employer*[.]"

(Emphasis supplied.) It is the *right* to control, not actual control, that is dispositive. *Oregon Drywall Systems v. Natl. Council on Comp. Ins.*, 153 Or App 662, 666, 958 P2d 195 (1998). Factors bearing on whether a person has the right to control another person include: (1) direct evidence of a right to control; (2) furnishing of tools and equipment; (3) method of payment; and (4) the right to discharge without liability. *Castle Homes, Inc. v. Whaite*, 95 Or App 269, 271, 769 P2d 215 (1989).

"[F]or the most part, any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation; while, in the opposite direction, contrary evidence is as to any one factor at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all."

3 Larson, *Workmen's Compensation Law* § 44.31, at 8-90 (1998). If the "right to control" factors are inconclusive, then it is appropriate to consider the relative nature of the work. *Id.* In this case, the ALJ determined, and DCBS affirmed, that the "right to control" test was inconclusive and that, under the "nature of the work" test, the installers were workers.

■ We agree with DCBS that the "right to control test" is indeterminative. Although petitioner clearly has attempted to establish a system by which independent installers are kept separate from employees, particularly in his use of contracts purporting to establish independent contractor status for certain installers on certain jobs, other aspects of petitioner's operation have blurred the line between employee and nonemployee.[6] Petitioner claims to have exercised no control over the installers' work methods, but the facts indicate some attempt by him to control the quality of the work. In addition, petitioner occasionally assigned employees to

---

[6] Because "worker" status is determined by statute, the fact that installers signed documents declaring themselves to be independent contractors, although evidence of the parties' intent, is not legally dispositive. *See Henn v. SAIF*, 60 Or App 587, 592, 654 P2d 1129 (1982).

work along with installers. It is not clear that he could control employees' work in such cases without also directing the installers. More troubling is the fact that petitioner would sometimes determine whether an installer was an employee after a job had begun. That suggests a greater degree of control over a project than typically would occur in a pure subcontracting situation. Furthermore, there is the fact that some installers identified themselves as employees of petitioner when questioned by state inspectors. Because the direct evidence of control is mixed, we must consider this factor to be neutral.

Additionally, although the installers supplied most of their own tools, petitioner supplied specialized equipment when needed. Hence, this factor must be viewed as neutral. The method of payment also is neutral at best. Although installers were paid in accordance with the contract and their progress on the project, they were paid at a rate determined by petitioner. *Compare Oregon Drywall Systems*, 153 Or App at 668 (subcontractors submitted bids and billings based on square footage or hours, based on their own assessment of the job, its difficulty and the time involved). As for the right to terminate, DCBS found no facts as to the consequences of an attempt by petitioner to remove an installer from an ongoing project, so we must rate this factor as neutral as well.[7]

Because the "right to control" test is inconclusive, we look to the relative nature of the work. Under that test, we take into account

> "the character of the [contractor's] work or business—how skilled it is, how much a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on—and its relation to the employer's business, that is, how much it is a part of the employer's regular work, whether it is continuous or intermittent, and whether

---

[7] The ALJ concluded that the "right to fire" factor weighed in favor of worker status because petitioner could refuse to offer future jobs to installers and installers could stop accepting jobs from petitioner. That is an incorrect conclusion. The exercise of a right not to deal with a particular installer in the future is consistent with the idea that a satisfactory end result is all that is aimed for by the contract, and is not, therefore, evidence of an employer-employee relationship. *See Henn*, 60 Or App at 592-93.

"the duration is sufficient to amount to the hiring of continuous services as distinguished from contracting for the completion of a particular job."

3 Larson, *Workmen's Compensation Law* § 43.52, at 8-27 to 8-28 (1998). The purpose of the nature of the work test is to consider factors that are relevant to the workers' compensation system rather than to the common-law issues involved in the right to control test. *Trabosh v. Washington County*, 140 Or App 159, 166, 915 P2d 1011 (1996). Under the nature of the work test, a worker whose services are a regular and continuing part of the cost of a product, and whose method of operation is not so independent that it forms a separate route through which the costs of industrial accident can be channeled, is presumptively a subject worker. *Id.* DCBS concluded that, under the nature of the work test, the installers were workers and not independent contractors. We agree.

The installers performed work that was identical to that performed by petitioner's employees and that was, indeed, an integral part of petitioner's business. The majority of the installers' work did not require any advanced skills or specialized knowledge. Because the installers were paid by petitioner and because petitioner set the rate of pay, the installers were not able to pass any increased cost of doing business on to the customer. Therefore, petitioner was in a better position to cover the cost of industrial accidents.

Furthermore, although each job was discrete and of limited duration, petitioner had an ongoing working relationship with the installers. The same installers worked for petitioner year after year. Some installers had been employees of petitioner in the past, and some had been hired on as employees by petitioner during the audit period. The record before us does not show that the installers worked with or for any other parties during the audit period. Again, the fact that petitioner could, at his discretion, decide at any time whether an installer would be an employee on a particular job blurs the distinction between employee and nonemployee for all jobs.

Petitioner bears the burden of proving that the installers were not employees. *Premsingh v. Natl. Council on*

*Comp. Ins.*, 111 Or App 624, 627, 826 P2d 120 (1992). We conclude that, on this record, DCBS properly could conclude that petitioner did not meet that burden. Accordingly, DCBS did not err in upholding the premium audit billings.

Affirmed.