Argued and submitted September 8, 2004, reversed and remanded May 18, 2005

Mark SCHMIDT
and Jacque Schmidt,
husband and wife,
*Appellants,*

*v.*

INTEL CORPORATION,
a California corporation,
*Respondent.*

C020497CV; A120695

112 P3d 428

Brian Jeanotte argued the cause and filed the brief for appellants.

Michael T. Stone argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Arnold, Judge pro tempore.

ARNOLD, J. pro tempore.

## ARNOLD, J. pro tempore

Plaintiffs, Mark Schmidt (Schmidt) and his wife, appeal the trial court's summary judgment dismissing their negligence, Oregon Employer Liability Law (ELL), and loss of consortium claims against defendant Intel. They assign error to the trial court's denial of their motion for summary judgment and its granting of Intel's motion for summary judgment on the ground that Schmidt was Intel's subject worker and, therefore, Intel is protected from liability by the exclusive liability provision of the workers' compensation law, ORS 656.018(1)(a).[1] Plaintiffs argue that Schmidt was not Intel's subject worker and therefore the exclusivity provision of the workers' compensation law does not bar their claims against Intel. Intel contends that it established that Schmidt was its subject worker for purposes of the workers' compensation law and, thus, workers' compensation is plaintiffs' exclusive remedy.[2] We reverse and remand.

The relevant facts are not in dispute. Intel entered into a construction management services contract (the contract) with Baugh Construction Oregon, Inc. (Baugh) for the construction of a "clean room" at its Aloha, Oregon, facility.[3] Baugh contracted with Oregon Electric Group, Inc. (Oregon Electric) to do the electrical work on the contract. Oregon Electric agreed to follow Intel's requirements for work done in the clean room, including its safety rules and clean room protocol. Under the contract, Intel could require Baugh to

---

[1] ORS 656.018(1)(a) provides, in part:

"The liability of every employer who satisfies the duty required by ORS 656.107(1) is exclusive and in place of all other liability arising out of injuries, diseases, symptom complexes or similar conditions arising out of and in the course of employment that are sustained by subject workers[.]"

[2] Intel also argues that plaintiffs should be estopped from pursuing their civil claims because Schmidt filed a claim and accepted workers' compensation benefits under a policy initiated and paid for by Intel. That argument, however, has been foreclosed by the Supreme Court's decision in *Day v. Advanced M&D Sales, Inc.*, 336 Or 511, 523-24, 86 P3d 678 (2004); we therefore decline to address it further.

[3] A "clean room" is a facility used to manufacture computer microprocessors. The name comes from the extremely high degree of cleanliness and air purity maintained in such facilities that is necessary for the manufacture of microprocessors. Such strict standards are necessary because even a single microscopic dust particle can destroy a computer microprocessor.

remove any employee or subcontractor for unsatisfactory performance, violation of the law, or violation of Intel's rules. Intel's safety rules and clean room protocol are comprehensive, governing the dress of workers entering the clean room and those work-related procedures necessary to maintain the strict level of cleanliness required in the clean room.

By the terms of the contract,[4] Intel retained the option of providing workers' compensation and employer's liability insurance coverage under an "owner controlled insurance program" (OCIP). Intel exercised its option to provide the insurance, purchasing a policy that covered up to $1 million liability per worker and self-insuring a $250,000 deductible on the policy.[5] Baugh and Oregon Electric were required to deduct the cost of their own workers' compensation insurance from their charges to Intel.

Schmidt is a union electrician employed by Oregon Electric. On March 7, 2000, while installing wiring on the clean-room project, Schmidt was injured when he fell through an uncovered area of the clean room floor from which a floor tile had been removed. At the time, Schmidt was working with another Oregon Electric electrician. An Intel engineer was present, assisting the electricians in determining where the wiring was to be located. Schmidt filed a workers' compensation claim against Intel's policy and received benefits for his injury.

As noted, plaintiffs asserted claims of negligence, ELL, and loss of consortium against Intel, and Intel asserted the workers' compensation exclusivity-of-remedy provision as an affirmative defense. Both parties moved for summary judgment. The trial court granted Intel's motion, denied plaintiffs' motion, and dismissed plaintiffs' claims. Plaintiffs now appeal.

■    When the material facts are not in dispute, we review the trial court's rulings on summary judgment to

---

[4] Intel's contract with Baugh is incorporated into Baugh's contracts with all of the subcontractors working on the Intel project.

[5] ORS 656.039 permits a carrier-insured or self-insured employer "of one or more persons defined as nonsubject workers or not defined as subject workers" to "elect to make them subject workers." The record contains no mention of such an election and neither party has argued that ORS 656.039 applies to this case.

determine whether the moving party was entitled to judgment as a matter of law. ORCP 47 C; *Mutual of Enumclaw Ins. Co. v. Gutman*, 172 Or App 528, 531, 21 P3d 101, *rev den*, 333 Or 162 (2001). The workers' compensation law requires

> "subject employers to 'maintain assurance * * * that subject workers of the employer * * * will receive compensation for compensable injuries' by either buying workers' compensation insurance coverage or by qualifying as a 'self-insured employer.' * * * [T]he statute immunizes employers maintaining such assurance from tort claims arising from injury to their subject workers."

*Blacknall v. Westwood Corporation*, 307 Or 113, 115, 764 P2d 544 (1988) (citations omitted). The employment relationship is the bedrock of the workers' compensation law; the key to determining whether a party is subject to the law is determining whether a worker is a "subject worker," as "[t]he statute's coverage of an employer is derivative of its coverage of a worker." *Martelli v. R.A. Chambers and Associates*, 310 Or 529, 537, 800 P2d 766 (1990) (internal quotation marks and citations omitted); *see also* ORS 656.023 (any employer of "one or more subject workers" subject to workers' compensation law).

When the relevant facts are not in dispute, whether a person is a "subject worker" for purposes of the workers' compensation law is a question of law. *Randall v. Ocean View Construction Co.*, 196 Or App 153, 156, 100 P3d 1088 (2004). Determining who qualifies as a "subject worker" depends on determining who retains the right to control. *S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 621-22, 872 P2d 1 (1994). Under the "right to control" test, the factors relevant to establishing an employment relationship include the following: (1) whether the employer retains the right to control the details of the method of performance, (2) the extent of the employer's control over work schedules, (3) whether the employer retains the right to discharge the worker, and (4) the payment of wages. *Id.* at 622. Additionally, in cases in which an employer retains the right to control some aspects of the work but not others, "it is essential that we consider the factors which make up the 'nature of work' test in deciding whether the control that [the] employer retains makes the relationship one of master and servant."

*Rubalcaba v. Nagaki Farms, Inc.*, 333 Or 614, 627, 43 P3d 1106 (2002). In evaluating the "nature of work" test, we consider factors such as whether the work at issue is a regular part of the employer's business, whether the work is continuous or intermittent, and whether the duration of the work is such that it qualifies as hiring for a continuing service or as contracting for the completion of a particular job. *Oregon Drywall Systems v. Natl. Council on Comp. Ins.*, 153 Or App 662, 666, 958 P2d 195 (1998).

■ We begin by considering whether Intel retained the right to control the details of Schmidt's performance. We note as an initial matter that Intel contends that plaintiffs cannot contest the issue whether Intel retained the right to control Schmidt's work because plaintiffs alleged in their complaint that "Intel retained the right to control and/or actually exercised control as to the manner in which the work was performed that resulted in plaintiff's injuries hereinafter alleged." Intel argues that plaintiffs should be estopped by that judicial admission and should not now be permitted to claim that Intel did not retain the right to control Schmidt's work. We do not agree.

Plaintiffs' allegation is not "by intention an act of waiver" relating to Intel's proof regarding Schmidt's status as a "subject worker" under the workers' compensation law; plaintiffs' allegation is an assertion made for the independent purpose of establishing their claim under the ELL. A party is permitted by rule to assert inconsistent claims in the same action. ORCP 16 C; *Jennison v. Providence St. Vincent Medical Center*, 174 Or App 219, 228, 25 P3d 358 (2001). We conclude that the allegation at issue does not constitute a judicial admission. Plaintiffs are not estopped from asserting that Schmidt is not a subject worker of Intel under ORS 656.018.

■ We turn to the parties' arguments on the merits. Plaintiffs contend that Intel did not retain the right to directly control Schmidt's work. Plaintiffs argue that Intel's right to control was limited to requiring the contractors, subcontractors, and their employees to follow its safety and clean room requirements and procedures. Furthermore, according to plaintiffs, whatever limited degree of control Intel retained

had to be exercised indirectly through either Baugh or one of its subcontractors.

Intel argues that Schmidt was subject to its direction and control, even if it did not always exercise its right to control directly, and thus that Schmidt was its subject worker. Intel asserts that the safety and clean room requirements that all contractors and subcontractors had to follow in order to work in the clean rooms, and the pervasive regulation that Intel exercised over the materials and personnel entering the clean rooms, indicate the degree to which Intel retained control of all workers involved in that project.

■ The issue of direction and control focuses partly on the "specific task" involved. *See Gibson v. Safeway Stores, Inc.*, 307 Or 120, 122, 764 P2d 548 (1988); *Demilly v. Butler Amusements, Inc.*, 177 Or App 106, 112, 33 P3d 343 (2001). In order to address that issue, the specific task must be identified. Here, the specific task was making electrical installations. *See* ORS 479.530(10). It is a fair inference from the record that the purpose of the contract with Oregon Electric was to make the electrical installations needed under the contract. ORS 479.620(2), a provision of the Electrical Safety Law, sets forth the requirement of supervision or control of anyone making an electrical installation. There is no evidence in the record that any person directly employed by Intel was qualified to "direct, supervise or control the making of an electrical installation" by Schmidt. Oregon Electric's foreman on the job ordered the tools and materials, disseminated information about the specific tasks, and made certain that the work was performed properly.

Of course, Intel's position is not that it supervised Schmidt in making electrical installations, but that it had the right to control cleanliness and safety. As pervasive and significant as the cleanliness and safety guidelines were, they were intended to ensure a clean environment and a safe workplace. Intel's control is qualitatively different from the right to control the method and manner of Schmidt's work of making the electrical installations. Intel's control was limited to collateral details of that specific task. *Cf. Oregon Drywall*, 153 Or App at 667 (right to control refers to right to control

method and manner of accomplishing result, not right to control details of the desired result). Intel did not retain the right to control Schmidt's method of performance.

We next consider whether Intel set the hours that Schmidt worked. There is no evidence in the summary judgment record that Intel had any control over Schmidt's working hours.

We turn to whether Intel retained the right to fire Schmidt. According to plaintiffs, Intel's right to remove unacceptable workers from the project was no greater than the right of any property owner to exclude a party from its premises; it did not amount to a right to fire. Intel contends that it could fire from the clean room project any "worker of a general contractor or * * * subcontractor if there was a violation of the Intel policies or procedures by that worker."

The unqualified right to fire is distinguishable from the right to terminate the contract of a subcontractor for genuine reasons of dissatisfaction. *Henn v. SAIF*, 60 Or App 587, 592-93, 654 P2d 1129 (1982), *rev den*, 294 Or 536 (1983). The record does not support a conclusion that a worker excluded from Intel's clean room because of noncompliance with safety or cleanliness guidelines would be fired from Oregon Electric's employ. In fact, during the time of the Intel job, Schmidt also worked in the Oregon Electric shop in Portland and at another site. Intel's right of removal was not the right to fire that is indicative of an employer-employee relationship. It is, rather, consistent with the "idea that a satisfactory end result is all that is aimed for by the contract." *Id.* at 593. Intel could exclude Schmidt from its premises, but it did not retain the right to fire him.

We finally consider the payment of wages. Plaintiffs point out that Schmidt's wages were paid by Oregon Electric; that remuneration ultimately came only indirectly from Intel. *Citing Whitlock v. State Ind. Acc. Com.*, 233 Or 166, 377 P2d 148 (1962), Intel argues that it does not matter whether the remuneration paid to Schmidt was direct or otherwise; because Intel was ultimately responsible for paying his wages, the remuneration prong of the employer-employee test is satisfied. Intel is mistaken.

Intel contracted for the construction of a clean room facility with Baugh, which in turn contracted with Oregon Electric for the installation of the electrical requirements of that facility. Such an indirect payment of funds, through two levels of contracting parties, cannot serve to make Schmidt Intel's subject worker under the workers' compensation law. *Martelli v. R.A. Chambers and Associates*, 99 Or App 524, 527, 783 P2d 31 (1989), *aff'd*, 310 Or 529, 800 P2d 766 (1990). As we stated in *Martelli*, " 'remuneration' contemplates a more direct *quid pro quo* between payment and services than the possibility that plaintiff's compensation as a worker will ultimately come from the contract payment to his employer." *Id.*

Intel's reliance on *Whitlock* does not persuade us otherwise. In *Whitlock*, the plaintiff sustained lead poisoning while painting a house as part of a fund-raising activity. 233 Or at 168. The owners of the house paid the remuneration for the plaintiff's work to the organization sponsoring the fund-raiser rather than directly to the plaintiff. *Id.* However, the homeowners retained the right to "direct and control the manner in which the services were rendered." *Id.* at 169. The court held that the fact that the plaintiff's wages were paid indirectly to him did not alter the essential employment relationship between the homeowners and the plaintiff because the plaintiff was entitled to assign his wages "to whomever he wished." *Id.* at 170-71. Thus, rather than acting in the manner of a contractor who directed the plaintiff's work and paid his salary, the organization to which the homeowners paid the plaintiff's wages was an assignee of the plaintiff.

In contrast, Schmidt did not assign his wages to Oregon Electric. In this case, Intel paid Baugh a set price for the completion of the clean room facility, which in turn paid Oregon Electric for the completion of the electrical installation in that facility, which then, in turn, paid Schmidt for his services. As in *Martelli*, the fact that Schmidt's wages may ultimately have come from Intel or Baugh's contract payment to Oregon Electric does not support the conclusion that Schmidt was Intel's subject worker. 99 Or App at 527.

We are persuaded that, under the right to control test, Schmidt was not a subject worker of Intel. However,

because Intel seems to have retained some control over Schmidt's performance in terms of the clean room procedures, and out of an abundance of caution, we also consider the "nature of work" test. That test reinforces our conclusion.

When evaluating the "nature of work" test, we consider factors such as whether the work at issue is a regular part of the employer's business, whether the work is continuous or intermittent, and whether the duration of the work is such that it qualifies as hiring for a continuing service or as contracting for the completion of a particular job. *Oregon Drywall*, 153 Or App at 666. Here, Schmidt's work was the installation of the electrical systems in an Intel facility. That work is not a regular part of Intel's business—the manufacture of computer microprocessors. Further, Schmidt's work was not of a continuous nature or for a continuing service; once the electrical installation at the clean room project was completed and Oregon Electric's contract was satisfied, Schmidt would no longer be employed at an Intel facility or on an Intel project.

For the foregoing reasons, we conclude that the trial court erred in granting Intel's motion for summary judgment and in denying plaintiffs' motion for summary judgment as to Intel's affirmative defense on the basis of the workers' compensation exclusive liability provision.

Reversed and remanded.