Argued and submitted November 16, 2011, reversed and remanded June 6, 2012

SAIF CORPORATION,
*Petitioner,*

*v.*

DEPARTMENT OF CONSUMER
AND BUSINESS SERVICES INSURANCE DIVISION;
and Northwest Children's Theater and School, Inc.,
*Respondents.*

Department of Consumer and Business Services
INS0803001; A147036

284 P3d 487

Karla H. Ferrall, Assistant Attorney General, argued the cause for petitioner. With her on the briefs were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Roy Pulvers argued the cause for respondent Department of Consumer and Business Services Insurance Division. With him on the brief was Hinshaw & Culbertson LLP.

Linda C. Attridge argued the cause for respondent Northwest Children's Theater and School, Inc. On the brief was David L. Jorling.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Walters, Judge pro tempore.

WALTERS, J., pro tempore

## WALTERS, J., pro tempore

In this case, we decide that the Department of Consumer and Business Services (DCBS) was required to use both the "right to control" and the "nature of the work" tests to determine whether certain individuals employed by the Northwest Children's Theater (NWCT) were "workers," as that term is defined in ORS 656.005(30), for whom NWCT was obligated to provide workers' compensation insurance, and that DCBS erred in failing to do so. We therefore reverse and remand.

NWCT operates an acting school and theater in northwest Portland. Its mission is to "educate, entertain, and enrich the lives of young audiences." In November 2007, SAIF conducted an audit of NWCT's operations and issued a premium audit billing reflecting its determination that all of the individuals employed by NWCT during the audit year— July, 1, 2006 to July 1, 2007—were "workers" who must be included on the NWCT payroll and covered by its workers' compensation insurance policy.

For that audit year, NWCT included on its payroll and provided workers' compensation insurance for only 13 of the many individuals who provided it with services. NWCT considered the other individuals to be independent contractors, not "workers," and appealed the premium audit billing to DCBS. For the purpose of that appeal, the parties grouped the disputed individuals into different categories: (1) instructors, (2) instructional assistants, (3) production designers,[1] and (4) actors (both child and adult). Following a contested hearing, an administrative law judge (ALJ) issued a proposed order affirming the billing in part and reversing it in

---

[1] The "production designer" category includes the following:

"guest directors, designers and musicians, assistant choreographers, assistant costume designers, assistant directors, assistant house managers, assistant stage managers, audio describers, carpenters, choreographers, composers, sound designers, costume shop managers, cover and poster illustrators, electricians, fight choreographers, fight directors, follow-spot operators, graphic artists, graphic designers, lighting designers, marketing assistant, music director, painters, parent liaison, photographers, printers, prop designers, properties designer, properties master, puppets, scenic artists, set designers, sound board operators, sound technicians, stagehands, stitchers, wardrobe masters, welders, wig, prosthetic, and makeup designer[.]"

part. Relevant to this judicial review, the ALJ concluded that NWCT instructors and instructional assistants were "workers," but that its production designers and actors were not. Both parties filed objections to the proposed order. The ALJ issued a revised proposed order but did not materially change her earlier conclusions.

The director of DCBS reviewed the ALJ's revised proposed order. The director agreed with the ALJ in all respects except one: the director determined that NWCT instructors were not "subject workers." SAIF petitioned for reconsideration, contending that DCBS had erred in classifying NWCT's instructors, production designers, and actors because it incorrectly applied the "right to control" and "nature of the work" tests used to determine whether they were "workers." DCBS adhered to its decision but clarified its reasoning in a revised final order containing findings of fact and conclusions of law.

In its conclusions of law, DCBS decided that the "right to control test" conclusively established that instructors, production designers, and actors were independent contractors and, therefore, that the "nature of the work" test was inapplicable. DCBS explained that

> "the 'nature of the work' test does not apply when the 'right to control' test conclusively indicates that the relationship between the employer and worker is not an employment relationship. *See Stamp v. DCBS*, 169 Or App 354 (2000)."

As a result, in its revised final order, DCBS deleted all prior references to the "nature of the work" test and held, on the basis of the "right to control" test alone, that instructors, production designers, and actors were not "workers" for whom NWCT was required to provide workers' compensation insurance.

SAIF seeks judicial review and contends that DCBS erred in that determination and that NWCT instructors, production designers, and actors are "workers" under ORS 656.005(30). When, as here, the basic facts are not in dispute, the question of an individual's status as a "worker" is one of law. *Rubalcaba v. Nagaki Farms, Inc.*, 333 Or 614, 619, 43 P3d 1106 (2002); *Oregon Drywall Systems, Inc. v. Nat'l*

*Council on Comp. Ins.*, 153 Or App 662, 666, 958 P2d 195 (1998).

A "subject employer" is required to provide workers' compensation insurance for "subject workers." ORS 656.023; ORS 656.027; ORS 656.017. Every employer employing one or more "subject workers" is subject to the workers' compensation statutes. ORS 656.023. A "subject worker" is a "worker" who is subject to the workers' compensation statutes. ORS 656.005(28). All "workers" are "subject workers" unless a statutory exception makes them nonsubject. *See* ORS 656.027 (listing exceptions). A "worker" is

> "any person, including a minor whether lawfully or unlawfully employed, who engages to furnish services for a remuneration, *subject to the direction and control of an employer* * * *."

ORS 656.005(30) (emphasis added). An employer is

> "any person * * * who contracts to pay a remuneration for and secures the *right to direct and control* the services of any person."

ORS 656.005(13)(a) (emphasis added).

There are two tests that are used to determine whether an individual is a "worker"—the "right to control" test and the "nature of the work" test. *Bovet v. Law*, 214 Or App 349, 353, 164 P3d 1186, *rev den*, 343 Or 467 (2007). The "right to control" test is predicated on the common-law distinction between a servant and an independent contractor. *Woody v. Waibel*, 276 Or 189, 192-94, 554 P2d 492 (1976). The "right to control" test examines whether the employer has a right to control the individual's performance. The "right to control" test includes four factors: "(1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire." *DCBS v. Clements*, 240 Or App 226, 234, 246 P3d 62 (2010); *Stamp v. DCBS*, 169 Or App 354, 357, 9 P3d 729 (2000); *Coghill v. Natl. Council on Comp. Ins.*, 155 Or App 601, 606, 964 P2d 1085 (1999).

The "nature of the work" test effectuates the purposes of the workers' compensation statutes. *Woody*, 276 Or

at 193-97. Starting with the premise that the workers' compensation system is "based upon the theory that the cost of industrial accidents should be borne by the consumer as a part of the cost of the product," *id.* at 194-95, that test permits consideration of the following factors:

> "[T]he character of the claimant's work or business—how skilled it is, how much of a separate calling or enterprise it is, to what extent it may be expected to carry its own accident burden and so on—and its relation to the employer's business, that is, how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether the duration is sufficient to amount to the hiring of continuing services as distinguished from * * * contracting for the completion of a particular job."

*Id.* at 195. As we have explained, the "nature of the work" test consists of two elements. The first is the character of the person's work or business—its skill, its status as a separate enterprise, and the extent to which it may be expected to carry the burden of its accidents itself. *Stamp*, 169 Or App at 358. The second is the relation of the person's work to the employer's business—how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether it is of sufficient duration to be the hiring of continuing services rather than contracting for a particular job. *Id.* at 359.

In this case, the parties disagree about the relationship between the two tests. SAIF takes the position that the two tests are to be applied together and relies on the Supreme Court's decision in *Rubalcaba* for the proposition that, "in situations in which there is *some evidence* suggesting that an employer retained the right to control the method and details of a claimant's work, a conclusion about the claimant's status depends on the analytical factors relevant to both tests." (Emphasis added.)

DCBS takes the position that, if the right to control test conclusively indicates that there is no right to control, then the "nature of the work" test is inapplicable. DCBS relies on this court's decision in *Stamp* for the proposition that we are to apply the "nature of the work" test "[i]f, and

only if," the "right to control" test is inconclusive. 169 Or App at 360. According to DCBS, that means that, if the application of the "right to control" test yields a conclusion—supported by substantial evidence and substantial reason—that the employer had no right to control an individual's performance, then a decision-maker is precluded from applying the "nature of the work" test. To the extent that *Rubalcaba* states otherwise, DCBS contends, its statement is *dictum.*

Thus, in the circumstance in which the parties present evidence that in some respects indicates a right to control, but that in others indicates a lack of a right to control, DCBS asserts that, as long as the decision-maker considers all of the evidence, applies the "right to control" test, and concludes, under that test, that an individual is not a "worker," the inquiry is complete. The decision-maker is neither compelled nor permitted to consider the "nature of the work" test. In contrast, SAIF asserts that, in that circumstance, there is "some evidence" of a right to control, and the decision-maker must apply not only the "right to control," but also the "nature of the work" test. For the reasons that follow, we agree with SAIF that it is the evidence presented and not the conclusion the decision-maker reaches that determines the applicability of the "nature of the work" test.

We begin our analysis with the Supreme Court's decision in *Woody*. There, the trial court concluded, using the common-law "right to control" test, that the individual in question was not a "worker" subject to the workers' compensation statutes.[2] In deciding whether the trial court erred, the Supreme Court began by observing that the evidence demonstrated that the employer had a right to control the individual's performance "in some respects but not in others."

---

[2] In 1976, when the court decided *Woody*, the workers' compensation statutes used the term "workman" instead of "worker," but both terms have essentially the same definitions. A "workman" was defined as

"any person, including a minor whether lawfully or unlawfully employed, who engages to furnish his services for a remuneration, *subject to the direction and control of an employer* and includes salaried, elected and appointed officials of the state, state agencies, counties, cities, school districts and other public corporations, but does not include any person whose services are performed as an inmate or ward of a state institution."

ORS 656.005(28)(1975) (emphasis added).

276 Or at 197. Indicating a right to control were the facts that either party could terminate the agreement without liability, the employer had some control over the individual's work schedule, and the parties did not contract for the performance of a specific piece of work. Indicating a lack of right to control were the facts that the employer paid the individual by the piece rather than by the hour, the individual furnished and maintained his own equipment, and the individual employed assistants and worked for other companies. *Id.* at 192 n 2. That competing evidence, the court decided, made it essential to consider both the "right to control" and the "nature of the work" tests to decide whether the relationship between the parties was subject to the workers' compensation statutes. *Id.* at 197.

In *Rubalcaba,* the Workers' Compensation Board (board) decided, using only the common-law "right to control" test, that an individual was not a "worker" under ORS 656.005(30). 333 Or at 618-19. The court observed that some of the factors relevant to the "right of control" test indicated a right of control, although others did not,[3] *id.* at 623-25, and held that,

> "when an employer has the right to control [an individual's] performance in some respects but not in others, 'it is essential that we consider the factors that make up the "nature of work" test in deciding whether the control that the employer retains makes the relationship one of master and servant.' "

*Id.* at 627 (quoting *Woody*, 276 Or at 197). That holding was not, as DCBS argues, *dictum*. The court specifically rejected the employer's argument that "the court applies the nature of the work test only if the evidence under the right to control test is so evenly divided that there is no principled way to decide employment status without resort to an additional test," *id.* at 626-27, and applied and relied on both the "right

---

[3] The facts that the court found to be indicative of the right to control were that the employer retained the right to fire the individual without incurring contractual liability, the employer required the individual to wait in line and receive a particular load, the individual was paid according to how much he hauled, and the employer contacted the individual when it needed him. The facts that the court found to be indicative of a lack of control were that the individual owned his own truck and the employer paid him by the volume hauled.

to control" and the "nature of work" tests in deciding that the board erred in concluding that the claimant in that case was not a "worker" under ORS 656.005(30).

Since *Rubalcaba*, this court has interpreted that case to require the application of the "nature of the work" test whenever "an employer has the right to control a claimant's performance in some respects but not others." *Bovet*, 214 Or App at 353; *Schmidt v. Intel Corp.*, 199 Or App 618, 622, 112 P3d 428 (2005). For instance, in *Bovet*, the court noted that evidence that the employer paid the individual on an hourly basis, retained the right to terminate the individual without contractual limitation, and told him where to work and what to accomplish on particular days constituted some evidence of a right to control, but the evidence that the individual provided his own tools, set his own work hours, and performed his work in accordance with a contract that he proposed pointed in the other direction. As a result, the court concluded that it was appropriate to apply the "nature of the work" test before reaching a final conclusion about whether the individual was subject to the workers' compensation statutes. 214 Or App at 353-54.

We do not view *Stamp*, the case on which DCBS relies and which it urges us to follow, as requiring a different decision. *Stamp* is a pre-*Rubalcaba* case, and, even assuming it has some continuing precedential value, we do not consider it necessarily inconsistent with *Rubalcaba* or with our post-*Rubalcaba* cases. In *Stamp*, the hearings officer applied the factors relevant to both the "right to control" and the "nature of the work" tests and concluded that the individual in question was a "worker" under the "nature of the work" test. On judicial review, this court agreed that the individual was a "worker" but applied only the "right to control" test to reach that result. Had the court followed *Rubalcaba* and applied both tests, we know from the factors considered and the conclusions reached by the hearings officer that the court would not have reached a different result. The factors relevant to the "nature of the work" test did not take away from, but provided additional support for, the court's conclusion that the individual in question was a "worker." To the extent that *Stamp* can be understood to preclude the use of the "nature of

the work" test when there is "some," but not "conclusive," evidence of a right to control, it is inconsistent with *Woody* and does not survive *Rubalcaba.*

In addition to relying on *Stamp* for its position, DCBS also asserts that the text of ORS 656.005(30) requires us to focus on whether an individual is subject to another's "direction and control."[4] Requiring the application of the "nature of the work" test when there is *some evidence* of a right of control, DCBS argues, runs afoul of that legislative mandate. DCBS contends that, because it is hard to conceive of any instance in which *some* fact would not point away from "direction and control," the "nature of the work" test will almost always be applicable and will swallow the "right to control" test. The legislature mandated the latter test, DCBS contends, and "no further test should be required."

That argument ignores, however, the genesis and purpose of the "nature of the work" test. In *Woody,* the Supreme Court explicitly decided that the legislature did not intend that the common-law "right to control" test be the exclusive measure of whether an individual is subject to another's "direction and control" and thus subject to the requirements of the workers' compensation statutes. 276 Or at 196-97. The court explained that, although "control is an essential ingredient in the test for determining who is a servant within the meaning of the [workers' compensation act]," the statutes do not "preclude a consideration of the factors germane to the relative nature of the work test in deciding whether there was sufficient control to denominate the relationship as one of master and servant." *Id.* In fact, the court emphasized, "to give meaning to our recognition * * * that the statute must be interpreted in light of the purposes of the [act], it is essential that we consider the factors which make

---

[4] DCBS asserts that the phrase "direction and control" is, under *Springfield Education Assoc. v. Springfield School Dist.*, 290 Or 217, 224-28, 621 P2d 547 (1980), an inexact statutory term that requires a determination of whether the DCBS final order is consistent with the legislative policy embodied in the meaning of that term and the legislature's intent underlying the general statutory framework. Identification of that policy and intent is, according to DCBS, determined by the rules of statutory interpretation, and their attention to statutory text, set out in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), and *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993).

up the 'nature of work' test." *Id.* at 197. Thus, the court held, an individual is not a "worker" unless there is "some evidence" of a right to control under the factors relevant to the common-law test, but when such evidence exists, a decision-maker cannot determine the individual's status based on that evidence alone. The decision-maker also must consider evidence relevant to the "nature of the work" factors. That does not mean that the "right to control" factors lose their weight or significance; it means only that those factors are not the exclusive measure of the individual's status. Thus, under the *Woody* framework, the factors relevant to the "nature of the work" test supplement, rather than swallow, the factors relevant to the "right to control" test. The decision-maker must consider the factors relevant to both tests and decide, in light of all of the relevant factors, whether the individual in question is a "worker" subject to the "direction and control" of an "employer" as those terms are used in ORS 656.005(30).

We conclude that, if there were *some evidence* that NWCT had a right to control instructors, production designers, and actors, DCBS was required to apply both the "right to control" and the "nature of the work" tests to determine whether those individuals were "workers" subject to the workers' compensation statutes. DCBS erred in concluding otherwise.

That does not, however, complete our inquiry on judicial review. NWCT argues that there was *no* evidence that it had the right to control its instructors, production designers, or actors and, therefore, that DCBS was correct to apply only the "right to control" test in this instance. Although DCBS does not join in that argument, we proceed to consider it.

We consider the findings of fact adopted by DCBS in its revised final order. We begin our statement of those facts with those pertaining to instructors.

NWCT's education director, an employee listed on the theater's payroll, managed the acting school. The education director determined the classes to be taught for a particular term and which of the school's classrooms would be used

for which classes. The education director then hired instructors appropriate to teach each class. Selection of specific plays, scripts, themes, skills, and methods of teaching was up to the instructors. During the audit year, NWCT hired 33 instructors, including a core group of 11 instructors who taught several classes each. Some of the instructors were local actors, and they often taught at different schools or performed at other theaters at the same time that they taught at NWCT.

NWCT entered into contracts with its instructors and designated them as "independent contractors." The contracts required the instructors to perform all services "agreed upon by Education Director and Instructor, including but not limited to time of class and performance." Instructors were responsible for "[c]onducting the class as agreed upon" and "[b]eginning and ending the class at agreed upon times." The contracts provided for lump sum payments to the instructors for each course that they taught and permitted termination "at any time prior to the end of the class or classes, for any reason deemed in good faith sufficient by NWCT."

NWCT provided instructors with classrooms, stages, sets, and administrative services. NWCT also provided costumes and props that instructors could use if they chose to do so, but often instructors also provided their own supplies and materials. The education director "observed what each instructor was doing and[,] if it was a lab class, she watched the production at the end of the lab." In practice, the education director did not interfere with or intervene in the way classes were taught and did not fire any of the instructors during the terms of their contracts.

In analyzing those facts, we observe first that NWCT's designation of its instructors as "independent contractors" is not controlling. *Woody*, 276 Or at 198-99. We look beyond the label that the parties attach to their relationship to the facts that describe it, and we conclude that the record includes *some evidence* that NWCT had a right to control the performance of its instructors. Through its education director, NWCT had the right to decide—and did decide—what classes to offer. The instructors could not teach whatever, wherever, and whenever they wanted. NWCT controlled the

services that the instructors provided, the way they conducted their classes, the beginning and ending times of each class, and which of the school's classrooms would be used for which classes. This court has recognized such evidence as indicative of a right to control under the "right to control" test. *See Bovet*, 214 Or App at 354 (evidence that employer "monitored the means, manner, and method by which the claimant completed his work by telling him where to work and what to do on particular days" constituted evidence of right to control); *Lockard v. The Murphy Company*, 49 Or App 101, 106, 619 P2d 283 (1980) (employer's designation of time and place of performance demonstrated worker status).

In addition, NWCT observed instructors' classes and lab productions and had the right to terminate an instructor's employment for any reason it deemed in good faith to be sufficient. Therefore, NWCT could decide, mid-contract, that it did not want to continue the services of an instructor and could terminate that instructor's contract in the absence of any breach of contract by the instructor. *Cf. Henn v. SAIF*, 60 Or App 587, 593, 654 P2d 1129 (1982) (fact that contract could be terminated only on individual's violation of terms of contract indicative of lack of control). That right existed even if NWCT did not exercise it, *see Clements*, 240 Or App at 234; *Coghill*, 155 Or App at 606 (right to control, not actual control, is dispositive), and it is a factor that points toward a right of control under the "right to control" test.

As NWCT argues, DCBS also found facts that pointed in the other direction. However, it is not necessary for us to discuss those factors at this juncture. The question before us is whether the findings of fact include some evidence that NWCT had a right to control the performance of its instructors. We conclude that they do.

We next examine those findings as they pertain to those individuals NWCT hired to direct and produce its plays. NWCT employed a number of those individuals and included them on its payroll. Those employees included an artistic director, a stage manager, and a technical director. The artistic director selected the plays and developed the budget for each. The artistic director then hired a director for

each play.[5] The stage manager attended the play rehearsals and, after the play director completed work, made sure that the play was executed according to the play director's vision. The technical director built the sets after receiving plans from the set designer.

NWCT did not include individuals involved in play production other than those employees on its payroll. The nonpayroll individuals worked as play directors, designers, choreographers, musical directors, and musicians and were included in the category that the parties defined as "production designers."[6]

Turning first to the play directors, DCBS found that they were responsible for setting a vision for a play and keeping its cost within a prescribed budget. The play directors signed contracts with NWCT that required them to allow the artistic director "artistic input, on artistic decisions (including, but not exclusive to casting, design, concept, textual changes, staging and interpretation)." The contracts gave the artistic director the right to approve final casting and responsibility for negotiating performer contracts. The contracts also required play directors to meet deadlines, attend specified meetings and rehearsals, and observe the rules of the building and NWCT management. NWCT could terminate contracts with its play directors, but only if the directors were unable or unwilling to fulfill their contractual commitments.

Some of that evidence indicates that NWCT had a right to control the performance of its play directors. The artistic director was a NWCT employee involved in all aspects of play production, and she had a right to provide the play director with input on casting, design, concept, textual changes, staging, and interpretation, and to make final decisions as to casting. And, as mentioned, NWCT contracts

---

[5] The artistic director served as a play director for some of the plays that NWCT produced during the audit period. The artistic director did not receive additional compensation for serving those dual roles. The parties referred to play directors other than the artistic director as "guest directors."

[6] We set out the complete description of the positions included in the production designer category above at 250 Or App 362 n 1.

required the play directors to meet deadlines, attend specified meetings and rehearsals, and observe the rules of the building and NWCT management. That contractual oversight was some evidence of a right to control the play directors.

The play directors selected the other production designers, including set designers, costume designers, prop designers, sound designers, lighting designers, choreographers, musical directors, and musicians.[7] Like the play directors, those other production designers brought their specific talents and skill sets to the production of the plays. However, production designers worked under the control of the play directors to fulfill the needs specified by the play directors. The other production designers also contracted with NWCT, and their contracts contained terms similar to those of the play directors. The contract of the production designers required them to work with the play director and the artistic director, meet deadlines, attend specified meetings and rehearsals, and observe the rules of the building and NWCT management.

Although the findings of fact also include competing evidence indicating that the production designers worked independently,[8] the evidence to which we call attention pointed to a right to control sufficient to make the "nature of the work" test applicable.

---

[7] The findings of fact do not specifically address other positions in the "production designer" category, such as painters, stitchers, carpenters, and other crafts people. The findings state that the ALJ viewed the testimony about the production designers to be "representative of that entire group." Accordingly, DCBS included all of the positions in the production designer category in its conclusion of law that individuals who worked in those positions were not "subject workers." On appeal, SAIF asserts that, as to the nondesigner people, that conclusion of law is not supported by substantial evidence. Given our disposition in this case, we need not reach that assignment of error. On remand, DCBS will have an opportunity to review the record and to treat the nondesigners differently, if appropriate.

[8] For example, set, costume, prop, lighting, and sound designers often worked off-site with their own supplies and equipment. When their products were delivered to the theater and any adjustments were made by the play director, they were paid and had no further involvement with the play. The choreographers choreographed and taught the scenes, and when that work was complete they were paid and had no further involvement with the play. The musical director directed the musicians and taught the actors any pieces that needed to be sung. Musicians practiced at home and brought their own instruments to the theater (with the exception of the piano, which was provided by NWCT).

Finally, we examine the facts that describe the relationship between NWCT and its actors, both adult and youth. During the audit year, NWCT used 99 actors that it recruited through local advertisements or hired from its acting school. Actors brought their specific talents and skill sets to the production of the plays. However, actors worked under the control of play directors and learned their lines from a script provided by NWCT. After the play directors completed their work, the stage manager attended rehearsals and made sure that the play was executed according to the play director's vision. Actors signed contracts with NWCT equivalent to those executed by play directors and production designers. Although, as DCBS argues, there certainly are ineffable qualities that actors bring to their performances, we conclude that the facts also reveal some evidence that NWCT had a right to control its actors' performances.

Because there was some evidence that NWCT had a right to control the performance of its instructors, production designers, and actors, DCBS erred when it failed to apply the "nature of the work" test in addition to the "right of control" test to decide whether individuals in those positions were "workers" and "subject workers" for whom NWCT was required to provide workers' compensation insurance. We therefore reverse and remand.

Reversed and remanded.