Argued and submitted March 8, 2011, affirmed February 27, 2013

RJ ENTERPRISES LLC OF OREGON,
dba homemeatmarket.com,
*Petitioner,*

*v.*

DEPARTMENT OF CONSUMER AND
BUSINESS SERVICES,
*Respondent.*

Department of Consumer and Business Services
INS0802001, INS0806005; A143127

298 P3d 567

Kevin D. Preston argued the cause for petitioner. With him on the briefs were Matthew A. Wand, Steven C. Maddoux, and Wand Maddoux Preston LLC.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Christina M. Hutchins, Senior Assistant Attorney General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

Petitioner, RJ Enterprises LLC, seeks review of a final order of the director of the Department of Consumer and Business Services (DCBS) that upheld audit billings for workers' compensation premiums for January 13, 2006 to February 1, 2007, and February 1, 2007 to February 1, 2008. Petitioner raises two assignments of error. First, petitioner challenges DCBS's determination that drivers who sell its products are "subject workers," ORS 656.017, for whom petitioner must pay workers' compensation premiums. Second, petitioner asserts that the administrative law judge (ALJ) erred in denying petitioner's motion to strike certain testimony, on which, it argues, the ALJ based her legal analysis. We conclude that the drivers are subject workers, and that, even assuming that the ALJ's failure to strike the disputed testimony was error, it was harmless. Therefore, we affirm.

## I. FACTS

We accept DCBS's factual findings regarding the drivers' relationship to petitioner, which petitioner does not challenge, and we review its legal conclusions for errors of law.[1] ORS 183.482(8)(a); *Rubalcaba v. Nagaki Farms, Inc.*, 333 Or 614, 619, 43 P3d 1106 (2002); *Stamp v. DCBS*, 169 Or App 354, 356, 9 P3d 729 (2000). Petitioner is a frozen meat and seafood distributor that uses drivers to market, sell, and deliver its inventory. In 2007 and 2008, petitioner's workers' compensation insurer, SAIF, conducted audits of petitioner's payroll. After each audit, SAIF assessed additional workers' compensation premiums based on its conclusion that petitioner's drivers were subject workers.[2] Petitioner challenged the audits and the assessments, requesting hearings before an ALJ. *See* ORS 737.318(3)(d) (providing for administrative appeal process for premium audit billings). The challenges were consolidated, and an ALJ presided over an evidentiary hearing. In a proposed

---

[1] As noted, petitioner's second assignment of error relates to the evidentiary record. As discussed below, 255 Or App at 459 the findings of fact that we accept do not rely on the disputed evidence.

[2] SAIF's increased billings were based on its conclusion that petitioner's payroll included nine driver-workers, one for each truck that petitioner owned.

order, the ALJ set out her findings of fact and concluded that the drivers were workers for whom petitioner had to provide workers' compensation coverage. Petitioner sought review by DCBS, which adopted the ALJ's findings of fact and conclusions of law.

Because our analysis requires detailed consideration of the facts, we set out the ALJ's findings at some length:

"RJ is a frozen meat distribution company. RJ purchases frozen, pre-cut, pre-packed meat and seafood (products) from a wholesaler. The wholesaler ships the products to RJ's refrigerated warehouse for sale under RJ's assumed business name 'Home Meat Market' (HMM).

"RJ maintains a website, HomeMeatmarket.com, listing the products and retail prices for its customers. The website instructs customers that they may order through the website or by phone and products will be delivered to the customer. Mr. Kollar, RJ's warehouse manager, made deliveries for orders placed through the website. However, during the audit period, 95 percent of RJ's revenue was derived from the drivers' efforts because RJ's products were predominantly sold by drivers.

"RJ solicits drivers through various methods, including business opportunity advertisements. An example of the advertisement is as follows:

"'Here's how our package works:

"'We provide all the product training.

"'We lease our fully refrigerated trucks to our contractors at a low daily rate. We consign all products daily without prepayment necessary.

"'We provide receipts, brochures and product information.

"'Everything you would have to invest thousands of dollars to get your business started, we provide for you.'

"Individuals who responded to the business opportunity advertisements were met by Mr. Kollar. Mr. Kollar explained RJ's business model and presented the drivers with RJ's Independent Contractor Agreement (ICA) solely scribed by RJ.

"*****

"During the audit period, RJ had at least nine vehicles that were equipped with a freezer and/or generator.[3] The vehicles had the HMM logo on them. RJ allowed the drivers the option of leasing one of these vehicles with a freezer and/or generator for a 12-hour shift. RJ required the drivers to pay for their own fuel. RJ paid the insurance and maintained and repaired the trucks and equipment. RJ set the lease fee at $25 per 12-hour shift and advised the drivers that the fee could be increased or decreased at RJ's discretion without any prior notice. RJ sometimes reduced the lease fee. RJ also waived the lease fees on those occasions when an existing driver took a new driver on a route. Pursuant to the ICA, RJ did not allow the drivers to have any riders in RJ's leased vehicle. However, to satisfy its insurance provider, RJ allowed riders on the vehicle as long as the riders signed a contract allowing RJ to check their motor vehicles report and determine if they had a valid driver license. * * *

"* * * * *

"A section [of the ICA] on 'Escrow Account' required drivers to accumulate an escrow account with a $250 minimum balance to insure against company losses, due to theft, etc. RJ did not enforce this section of the ICA.

"* * * * *

"RJ did not provide leads, routes or territories and did not require any drivers to appear on any particular day or time. The drivers set their own hours of work and chose their own sales areas. On a typical day, RJ opened at 8:30 a.m. Drivers started showing up to RJ's location and RJ gave products to the drivers to sell and leased trucks based upon availability, not on the time of the day. Some drivers had their own trucks. Those who did not have their own truck[s] leased from RJ. RJ leased the trucks on a first come first served basis. The drivers notified Mr. Kollar of the number of boxes of product they would take for the day. Mr. Kollar, in his sole discretion, determined whether to fill the order as requested by the driver or to withhold some product due to the driver not having enough credit.

---

[3] The ALJ found that some drivers owned their own trucks and that one of those drivers, Setera, also obtained a business license, made brochures, and set his own prices. However, as noted above, SAIF's billing was for the nine driver-workers who leased trucks from petitioner, not those, including Setera, who owned their own trucks.

If [RJ] did not have the requested product, [RJ] offered other product. The drivers were not allowed in RJ's walk-in freezer. Therefore, Mr. Kollar assembled the order and put it on a cart. The drivers did not pay any money up front. The drivers took the cart to their own or leased vehicle and loaded the products on to their vehicle. The drivers then left to make their sales to their customers.

"*  *  *  *  *

"When the drivers returned to the warehouse at the end of their shift they checked in with Mr. Kollar or Mr. Russell[, one of RJ's owners]. RJ either restocked the unsold products or the driver purchased and retained the product. If RJ restocked the unsold product, RJ subtracted the unsold products from the products consigned to a driver on the consolidated daily sales record. RJ charged the drivers depending on the number of products the driver took on consignment. RJ settled the account with each driver at the time the driver paid for the consigned products by allowing the driver to keep the difference between the price paid by their customers minus the cost of the product price set by RJ, less the $25 truck lease fee and other fees, also set by RJ. In instances where the drivers received more in checks and credit card transactions than they owed RJ and used the checks or credit cards to settle their accounts with RJ, RJ paid them the difference in cash, as opposed to with a check. In those cases where credit card transactions and checks were not sufficient to settle a driver's account, RJ required the drivers to make up the difference in cash. RJ also extended credit to some drivers and kept a record of the credit on a ledger.

"RJ provided brochures to the drivers when the driverspurchased products. The brochures listed HomeMeatmarket.com as the business with its telephone number and address and had a blank line under which it stated 'Authorized Dealer.' The brochures had an additional line designated for the area distibutor's cell phone number. Additionally, the brochures provided product descriptions and 'distributor's special prices.' RJ also provided receipts. The receipts also listed HomeMeatmarket.com as the business with its telephone number and address and had a designated line for a distributor's name."

(Citations and paragraph numbers omitted.)

The ICA characterizes the drivers as independent contractors, not employees, of petitioner. It provides, in part:

> "It is the expressed intent and purpose of the parties to enter into a relationship of Company-Independent Contractor. COMPANY shall not have control over CONTRACTOR'S place of performance except when COMPANY becomes aware of non-compliance with state and/or federal laws including consumer affairs regulations. CONTRACTOR shall sell COMPANY products whenever, however, and to whomever CONTRACTOR chooses at CONTRACTOR'S sole and absolute discretion.
>
> "* * * * *
>
> "The parties hereto recognize and agree that CONTRACTOR is an independent contractor and not an employee of COMPANY. Therefore, COMPANY [does] not provide Workers Compensation for CONTRACTOR, nor does it take any federal or state withholdings. CONTRACTOR agrees that it is Contractor's sole responsibility to obtain and maintain in full force and effect workers compensation and to pay any and all federal, state taxes, social security, and unemployment charges."

(Capitalization in original.)

Under the ICA, petitioner retains discretion to determine the amount of product credit extended to each driver, and the driver promises to pay in full at the end of each day for all products received on consignment that day. Petitioner guarantees "taste, tenderness and wholesomeness" of the products, but does not guarantee any particular grade of meat, and petitioner may terminate the contract if the driver makes any promise of "choice" grade meat to customers or if the driver makes any "untrue, misleading, or deceptive" statement. The driver is to maintain product "in good condition until it is sold" and is prohibited from selling it to a consumer "unless it has a good appearance." Petitioner retains exclusive control over complaints: "Complaints are to be reported to the manager and are not to be handled by Contractor."[4]

---

[4] Petitioner argues that it provides a product warranty and handles only complaints regarding product quality. It asserts that it does not handle complaints other than those concerning product warranties. The ALJ found petitioner's witnesses not to be credible to the extent that their testimony conflicted with

The ICA also sets out the terms that govern the leasing of petitioner's trucks by drivers. It states that a driver may lease a truck, freezer, and generator from petitioner for $25 per 12-hour shift. Petitioner is responsible for insuring, maintaining, and repairing the trucks, and the driver is responsible for "pay[ing] for all fuel used."[5] Although petitioner is responsible for insuring the trucks, it reserves the right not to file an insurance claim and, instead, to charge the driver if the driver is at fault in an accident. In addition, the driver agrees that, in case of an accident, he or she "will be held fully responsible for any and all claims, lawsuits, and/or any traffic fines" and will "hold [petitioner] harmless from all claims, losses, causes of action, and expenses, including legal expenses rising from the use, maintenance and operation of" the truck.

Leased trucks are "to be used by [the driver] exclusively for the purveyance of products consigned on a daily credit basis."[6] The driver is responsible for keeping a leased truck "clean so that it shall at all times present a neat appearance" and promises to operate the truck "in a careful manner and in conformity with all applicable federal and state laws and city ordinances." The driver also promises not to allow any riders in a leased truck and not to carry or use any "alcoholic beverages, illegal drugs, illegal substances, or drug paraphernalia" in a leased truck.

Under the ICA, all drivers are required to inform petitioner if they are cited for a moving violation. The ICA states:

> "I understand the great responsibility placed upon me as a contractor/driver for RJ Enterprises, LLC. That responsibility is to the company, its employees, fellow

the provisions of the ICA. The ICA does not limit petitioner's responsibility for complaints to complaints regarding product quality. Consequently, the record indicates—and, indeed, the ALJ expressly found—that petitioner has the "sole right" to handle customer complaints.

[5] It is not clear from the record whether the drivers actually filled the trucks with fuel, or whether petitioner provided fuel and charged the drivers for it.

[6] Petitioner contends that "the evidence before the Court indicates that the drivers are free to sell other products from the trucks." However, as noted, the ALJ found petitioner's witnesses not to be credible to the extent that their testimony conflicted with the provisions of the ICA. The ICA indicates that the trucks are to be used exclusively for the purveyance of petitioner's products. Therefore, the record indicates that the drivers are *not* free to sell other products from the trucks.

contractors, and the general public. Driving a vehicle for RJ Enterprises, LLC is a privilege associated with my contract. By my initials below, I acknowledge that I have read and understand these criteria. Furthermore, I understand that it is my responsibility to report my being cited for ANY moving violation to the manager as soon as possible after the citation."

(Capitalization in original.) As soon as a manager learns that a driver has been cited for a moving violation, the driver "will be counseled (by manager) regarding his/her responsibility to operate motor vehicles in a safe, mature, defensive manner." In addition, if a driver who is "convicted of two or more moving violations in any vehicle, not just an RJ Enterprises, LLC vehicle, will lose the option of leasing a vehicle from RJ Enterprises, LLC."

## II. SUBJECT WORKERS

On judicial review, petitioner contends that the ALJ and DCBS erred in concluding that the drivers are subject workers. That is a conclusion of law, which we review for errors of law. *Rubalcaba*, 333 Or at 619. A petitioner bears the burden of proving, by a preponderance of the evidence, that SAIF's billing was incorrect. *Salem Decorating v. Natl. Council on Comp. Ins.*, 116 Or App 166, 170, 840 P2d 739 (1992), *rev den*, 315 Or 643 (1993).

Under Oregon law, an "employer" must provide workers' compensation coverage for its "subject workers." ORS 656.017(1). In making the determination whether drivers are subject "workers," the initial inquiry is whether they are "workers" within the meaning of the workers' compensation law. *S-W Floor Cover Shop v. Natl. Council on Comp Ins.*, 318 Or 614, 630, 872 P2d 1 (1994). A "worker" is "any person * * * who engages to furnish services for a remuneration, subject to the direction and control of an employer[.]" ORS 656.005(30). In turn, an "employer" is "any person * * * who contracts to pay a remuneration for and secures the right to direct and control the services of any person." ORS 656.005(13)(a). All "workers" are subject workers unless an exception applies. ORS 656.027.

Thus, whether a person is a subject worker depends on (1) whether the person agrees to provide services for

remuneration and (2) whether the person's services are subject to the putative employer's direction and control. *DCBS v. Clements*, 240 Or App 226, 232, 246 P3d 62 (2010). Here, we consider those issues in reverse order, beginning with whether the drivers were subject to petitioner's direction and control.

A. *Direction and Control*

In determining whether the drivers were subject to petitioner's direction and control, we apply the "right to control" test. *See Rubalcaba*, 333 Or at 627; *SAIF v. DCBS*, 250 Or App 360, 370, 284 P3d 487 (2012). Because "there is some evidence suggesting that [petitioner] retained the right to control the methods and details of [the drivers'] work" we also apply the "nature of the work" test. *Rubalcaba*, 333 Or at 623-25; *see also SAIF v. DCBS*, 250 Or App at 368-70 (discussing the relationship between the "right to control" test and the "nature of the work" test). Considering the evidence as it pertains to the factors of both of those tests, we conclude that the drivers were subject to petitioner's direction and control. *See Rubalcaba*, 333 Or at 627 ("[I]n situations in which there is some evidence suggesting that an employer retained the right to control the method and details of a claimant's work, a conclusion about the claimant's status depends on the analytical factors relevant to both tests."); *SAIF v. DCBS*, 250 Or App at 370 ("The decision-maker must consider the factors relevant to both tests and decide [whether the individual is a worker] in light of all of the relevant factors[.]").

1. *"Right to Control" Test*

"The principal factors in the traditional test of the right to control are: [a] direct evidence of the right to, or the exercise of, control; [b] the method of payment; [c] the furnishing of equipment; and [d] the right to fire." *Castle Homes Inc. v. Whaite*, 95 Or App 269, 272, 769 P2d 215 (1989); *see also Coghill v. Natl. Council on Comp. Ins.*, 155 Or App 601, 606, 964 P2d 1085, *adh'd to as modified on recons*, 157 Or App 125, 966 P2d 830 (1998), *rev den*, 328 Or 365 (1999) (listing the same factors).

> "'For the most part, any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation; while, in the opposite direction, contrary evidence is as to any one factor at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all.'"

*Coghill*, 155 Or App at 606 (quoting 3 Larson, *Workmen's Compensation Law* § 44.31, at 8-90 (1998)); *Cy Investment, Inc. v. Natl. Council on Comp. Ins.*, 128 Or App 579, 584, 876 P2d 805 (1994).

### a. Direct Evidence of Right to, or Exercise of, Control

We agree with the ALJ that the record contains direct evidence of petitioner's right to control, and exercise of control over, the methods and details of the drivers' work. Although it carries some weight, the ICA's characterization of the drivers as independent contractors is not determinative. *See, e.g.*, *Woody v. Waibel*, 276 Or 189, 198-99, 554 P2d 492 (1976); *SAIF v. DCBS*, 250 Or App at 371; *Coghill*, 155 Or App at 606 n 6.

First, petitioner controlled what the drivers could sell: It controlled the amount and type of product the drivers could sell, and it prohibited the drivers from selling anything other than its products from its trucks. Petitioner also exercised some control over how the drivers could sell its products: It limited the promises that the drivers could make while they sold its products, permitting them to promise "taste and wholesomeness" but prohibiting them from making promises about the grade of the meat. Petitioner also mandated that "[p]roduct is to remain in good condition until it is sold. It should not be sold to a consumer unless it has a good appearance." As a practical matter, petitioner also controlled the price and description of its products and the receipts that customers received by providing the drivers with brochures and receipts.

Petitioner's control extended to the drivers' behavior on the road. It required all drivers to report "ANY moving violation to the manager as soon as possible after the citation." (Capitalization in original.) And, petitioner

reserved the right to counsel a cited driver "regarding his/her responsibility to operate motor vehicles in a safe, mature, defensive manner[.]"

Petitioner strengthened its ability to enforce its standards by maintaining exclusive control over customer complaints. As noted, the ICA provides, "Complaints are to be reported to the manager and are not to be handled by Contractor."

Petitioner also controlled the operation of the leased trucks and who could drive and ride in them. It required the drivers to keep the trucks clean at all times and prohibited drivers from carrying or using alcohol or illegal drugs in the trucks. Because petitioner also prohibited any riders in the trucks, the drivers could not hire delivery assistants without petitioner's approval.[7]

We acknowledge that petitioner did not control all of the methods and details of the drivers' work. Petitioner did not provide the drivers with territories, routes, or customers. It did not provide extensive training, although it did facilitate training by waiving the truck-rental fee when experienced drivers took new drivers with them on their routes. Nevertheless, there is some direct evidence of petitioner's right to control, and exercise of control over, the methods and details of the drivers' work.

Petitioner's argument that its control over the occupants and operation of its trucks cannot demonstrate a right to control the drivers because it is merely an effort to limit potential liability arising from the truck rentals and "appease its insurance provider" is unavailing. At this stage, the relevant question is whether petitioner had the right to control, or did control, the drivers' work; it is not whether petitioner had a legitimate business reason to retain the right to control the drivers' work.

Petitioner argues that *Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 45 P3d 936 (2002), provides a relevant comparison to this case and demonstrates that

---

[7] As set out above, the ALJ found that, despite the ICA's prohibition on riders, petitioner "allowed riders in the vehicles as long as the riders signed a contract allowing [petitioner] to check their motor vehicles report and determine if they had a valid driver's license."

petitioner did not retain the right to control the drivers. In *Schaff*, the plaintiff alleged that a negligent driver, Stockert, was an employee of the defendant, a meat and seafood distributor. *Id.* at 96. The plaintiff sought damages for personal injury on a theory of vicarious liability. Under the common law "right to control" test and the vicarious liability cases interpreting it, the Supreme Court concluded that Stockert was an independent contractor, not an employee. *Id.* at 107.

One of the issues that the parties disputed concerned the role of the jury in deciding whether Stockert was an employee or an independent contractor. The court rejected the defendant's argument that that determination was not one that the jury could make. The defendant's argument relied on *Woody*, 276 Or 189, a case involving a dispute about "subject worker" status under the workers' compensation statutes. The court explained,

> "Defendant argues that this court announced a contrary rule in [*Woody*]. * * * We find *Woody*, a case decided with respect to worker's compensation statutes, to be of limited relevance to our discussion of the role of the court and jury in the context of common-law vicarious liability. *See, e.g., id.* at 193 ('The criteria in the workmen's compensation cases are keyed to the purpose of the workmen's compensation laws.')."

*Schaff*, 334 Or at 101 n 3.

Similarly, here, the common law "right to control" test, as applied in cases involving vicarious liability, including *Schaff*, is of limited relevance to the question before us—whether the drivers are "subject workers" under the workers' compensation law. As the Supreme Court noted, the underlying concerns in workers' compensation cases— ultimately, that "the cost of industrial accidents should be borne by the consumer as a part of the cost of the product," *Woody*, 276 Or at 195—are different from those in vicarious liability cases.[8]

---

[8] Even if the analysis in *Schaff* were relevant, petitioner's argument would remain unavailing because *Schaff* is distinguishable from this case on its facts. In three major respects, the relationship in *Schaff* involved less control than the relationship here: First, Stockert did not lease the truck from the putative employer, and, consequently, the putative employer did not insure the truck or

### b. Method of Payment

Petitioner compensated the drivers by allowing them to keep the difference between the price paid by customers and the product price set by petitioner, less the $25 truck lease fee and other fees. "[W]hen payment is by quantity, the method of payment factor becomes neutral." *Kaiel v. Cultural Homestay Institute*, 129 Or App 471, 879 P2d 1319, *rev den*, 320 Or 543 (1994); *see also Castle Homes, Inc.*, 95 Or App at 272 (explaining that the method of payment was "not particularly significant" where the "[c]laimant was paid strictly on commission"). Thus, we conclude that, in this case, the payment factor is neutral.

### c. Furnishing of Tools and Equipment

Next we consider the third factor, the furnishing of tools and equipment. Petitioner argues that, because its drivers paid for the use of the trucks, it cannot be considered to have furnished them. However, as petitioner's driver-recruitment advertisement explained, petitioner provided the trucks at "low daily rates" intended to enable drivers to lease them without any significant financial investment of the type that would ordinarily be required if the drivers were operating their own independent businesses. The trucks bore petitioner's logo. Petitioner insured and maintained the trucks and retained control over them by screening the driving records of drivers and passengers and setting standards for the trucks' appearance and cleanliness. Finally, as noted above, the drivers were prohibited from selling anything other than petitioner's products from the trucks. Those facts, considered together, demonstrate that petitioner was not merely a meat distributor that operated a truck-rental business on the side. Instead, those facts demonstrate that petitioner's purpose in providing the trucks was to equip the drivers to sell petitioner's products, for petitioner's benefit. Indeed, under the ICA, the trucks could not be used for any other purpose.

---

exercise control over how Stockert drove or who rode in the vehicle. *Schaff*, 334 Or at 97. Second, Stockert was permitted to, and did, sell items other than the putative employer's products from his truck. *Id.* at 104. And, third, Stockert purchased products from the defendant weekly; he did not take the products on consignment and return unsold products at the end of the day. *Id.* at 98.

Petitioner argues that the drivers' independent nonemployment status is evidenced by the fact that the drivers were required to provide some of their own tools and equipment: check and credit card processing, bank accounts, clothing, and sunglasses. A number of facts refute that argument. First, as the ALJ found, petitioner's driver-recruitment advertisement belies the assertion that the drivers were required to provide any business-related tools or equipment. The advertisement explains that petitioner will provide "[e]verything" that a driver needs to sell petitioner's products.

Second, petitioner's practices bear out the promises of the advertisement: Although petitioner argues that the drivers were required to provide numerous items themselves, petitioner actually provided some of those items to the drivers, and others were unnecessary because of the way petitioner's operation was organized. In addition to trucks, petitioner provided check and credit card processing. And, because of the way petitioner designed its business, the drivers could sell its products and be compensated without bank accounts and without submitting invoices to petitioner.

Contrary to petitioner's argument, the fact that the drivers had to provide their own clothing and sunglasses does not compel a different conclusion. If petitioner had provided its drivers with uniforms, that would certainly be a fact supportive of the "right to control." However, a worker's responsibility for providing his or her own clothing and sunglasses does not indicate that the putative employer lacks direction and control over the methods and details of his or her work, especially when there is no indication that any special attire or gear is required for the work.

d.   Right to Fire

The fourth factor, the right to fire, is inconclusive. Another case that evaluated that factor with respect to a single-shift contract like those at issue here is illustrative. In *Cy Investment, Inc.*, 128 Or App 579, Cy's, a nightclub, scheduled dancers on a shift-by-shift basis. The dancers "selected the time, date, and frequency of their work." *Id.* at 581. We described and analyzed the evidence as follows:

"There is no evidence that Cy's ever terminated a dancer in mid-shift. Moreover, although Cy's retained, and exercised, the ability not to invite dancers back, there is no evidence that Cy's ever prevented a dancer from working a previously-scheduled shift. On the other hand, because the work 'contracted' for is of such limited duration, Cy's ability to prevent a dancer from signing up for additional shifts approaches a 'right to fire' even if Cy's never actually prevented a dancer from working a previously scheduled shift."

*Id.* at 584. Similarly, here, there is no evidence that petitioner ever terminated a driver's ICA mid-shift. However, petitioner retained discretion to determine how much product a driver could take on a shift and whether a driver could lease a truck for the day, effectively retaining the right to terminate the relationship on any given day. As in *Cy Investment, Inc.*, here, where the agreement between the parties pertained to only a single shift at a time, petitioner's ability to prevent a driver from selling its products on future days "approaches a 'right to fire.'" *Id.* At best, this factor is inconclusive, as it was in *Cy Investment, Inc.*

In sum, two "right to control" factors—direct evidence of right to, or exercise of, control, and furnishing of tools and equipment—indicate that the drivers are workers. The other two factors—method of payment and right to fire—are inconclusive.

2. *"Nature of the Work" Test*

We next turn to the "nature of the work" test. We recently explained that "[t]he 'nature of the work' test effectuates the purposes of the workers' compensation statutes," beginning "with the premise that the workers' compensation system is 'based upon the theory that the cost of industrial accidents should be borne by the consumer as a part of the cost of the product.'" *SAIF v. DCBS*, 250 Or App at 364-65 (quoting *Woody*, 276 Or at 194-95).

"[T]he 'nature of the work' test consists of two elements. The first is the character of the person's work or business—its skill, its status as a separate enterprise, and the extent to which it may be expected to carry the burden of its accidents

itself. The second is the relation of the person's work to the employer's business—how much it is a regular part of the employer's regular work, whether it is continuous or intermittent, and whether it is of sufficient duration to be the hiring of continuing services rather than contracting for a particular job."

*Id.* (citations omitted). "[A] worker whose services are a regular and continuing part of the cost of a product, and whose method of operation is not so independent that it forms a separate route through which the costs of industrial accident can be channeled, is presumptively a subject worker." *Coghill*, 155 Or App at 608.

### a. Character of the Drivers' Work or Business

The first of the two factors—the character of the drivers' work or business—weighs heavily in favor of the drivers being subject workers, because their "method of operation is not so independent that it forms a separate route through which the costs of industrial accident can be channeled." *Id.* Petitioner's driver-recruitment advertisement promised,

"We provide all the product training.

"We lease our fully refrigerated trucks to our contractors at a low daily rate. We consign all products daily without prepayment necessary.

"We provide receipts, brochures and product information.

"Everything you would have to invest thousands of dollars to get your business started, we provide for you."

The drivers provided their services; petitioner provided everything else. They needed no specialized skills, offices, bank accounts, records, brochures, or equipment. They provided no cash until they had sold—and, accordingly, received payment for—petitioner's products. They were not permitted to hire assistants without petitioner's permission. In short, despite petitioner's assertion that the drivers were independent contractors with their own businesses, the drivers' "businesses" were actually part of petitioner's business.

### b. Relation of the Drivers' Work to Petitioner's Business

As to the second factor, the ALJ stated,

"The drivers' work formed an essential and regular part of RJ's work. RJ is engaged in business as a *retail* distributor of meat products. Under its current business model, RJ needs drivers to sell and distribute its products. The drivers provide this service—sell and distribute products. Without the services of these drivers, RJ cannot operate under its current business model unless it hires drivers as employees to do the work[.]"

(Emphasis added.)

Petitioner disagrees with that analysis. Its argument reduces to a contention that the ALJ was incorrect in describing petitioner as a retail distributor; instead, it asserts, it is a wholesale distributor. Said another way, the ALJ concluded that petitioner's business included the drivers' purported businesses; petitioner disputes that conclusion. Petitioner argues that the drivers' services were not a "regular and continuing part of the cost of [the] product," *Coghill*, 155 Or App at 608, because the drivers were its customers and its product was wholesale meat that the drivers purchased and resold to consumers.

As noted above, however, we agree with the ALJ's conclusion that petitioner's business included the drivers' purported businesses. Petitioner was a retail distributor: It purchased the meat from wholesalers and provided drivers with the products, accounting, and equipment necessary for retail sales; it prohibited the drivers from selling other products and prevented them from hiring assistants; and it had exclusive control over customer complaints. In light of that conclusion, the drivers' services were "a regular and continuing part of the cost of [the] product" because the product was petitioner's meat and seafood, sold to consumers at retail. Together, the drivers' services were continuous, and they provided petitioner with 95 percent of its revenue. Thus, considered together, the "right to control" and "nature of the work" tests indicate that the drivers were subject to petitioner's direction and control. ORS 656.005(30).

## B.  *Services and Remuneration*

Next we turn to whether the drivers agreed to provide services in exchange for remuneration. ORS 656.005(30). The ALJ concluded that they did. In doing so, she rejected petitioner's contention that the relationship between petitioner and the drivers was one of vendor and vendee. Instead, as discussed above, the ALJ concluded that petitioner was a retailer, not a wholesaler. She explained,

> "Any unsold product was restocked for sale and consigned the next day to the same or another driver. The record established that if there was a customer complaint, RJ handled the complaint, presumably by replacing the product without charge to the driver. The substance of the transaction was not that of a vendor-vendee relation and title to the product did not pass in any realistic sense given the ease of returning the product the same day if it did not sell. Thus, the drivers were in reality commissioned sales people and their remuneration was the difference between the wholesale price and the retail price to customers."

Petitioner argues that that conclusion is incorrect because the drivers do not pay their gross receipts to petitioner; instead, they settle their accounts at the end of the day by paying petitioner for any products that they have sold. Petitioner also contends that the drivers' use of its credit card and check services does not establish remuneration; instead, when it accepts the checks and credit cards and pays the drivers in cash, it merely "makes change." Furthermore, petitioner asserts, "The drivers are free to sell to the customers of their choosing, for the prices that they set solely within the exercise of their own business judgment."

As explained above, however, we agree with the ALJ's conclusion that petitioner ran a retail business. It controlled the way the drivers did their work; controlled the condition and appearance of its products; provided its contact information to customers; handled complaints; and, in practice, set the prices for the products through the brochures. In light of that conclusion, the ALJ was correct that the drivers were commissioned salespeople; their commission was the difference between the amount

petitioner charged them for the products, plus fees, and the retail price.

Thus, we conclude that the drivers were "subject workers," ORS 656.017, because they agreed to provide services for renumeration and were subject to petitioner's direction and control.

## III. DENIAL OF MOTION TO STRIKE

In its second assignment of error, petitioner argues that the ALJ erred in denying its motion to strike portions of the testimony of Grove, SAIF's auditor, who testified that, based on his audit of petitioner's records, he concluded that the drivers were subject workers. Petitioner argues that Grove presented expert testimony and that he "admitted that, in forming his opinion of whether the drivers were workers, he relied upon an audit file associated with a DCBS prior opinion," namely, *Cattlemen's Steak & Seafood Co.*, INS 95-06-009 (1997) (*Cattlemen's*). Petitioner sought, and was denied, discovery of the *Cattlemen's* audit file. As a result, according to petitioner, the ALJ was required to strike any portion of Grove's testimony that was based on the audit file. Because the ALJ did not strike that testimony, petitioner argues, petitioner "was denied the ability to adequately cross examine [Grove], thus denied its right to Due Process of Law."

We reject petitioner's argument, because petitioner has failed to show that its rights were substantially prejudiced by any error. *See* ORS 183.450(1) ("[E]rroneous rulings on evidence shall not preclude agency action on the record unless shown to have substantially prejudiced the rights of a party."). The ALJ, DCBS, and this court are all charged with determining, independently and as a matter of law, whether the drivers are subject workers. *Rubalcaba*, 333 Or at 619; *SAIF v. DCBS*, 250 Or App at 363 (discussing legal conclusions of the ALJ and DCBS). In response to petitioner's objection to Grove's testimony, the ALJ explained that she had considered only the evidence regarding petitioner's relationship with its drivers, not the disputed evidence. The ALJ's analysis bears that out: In the proposed order, in accord with the requirement of

substantial reason, she applied the law to the facts regarding petitioner's relationship with its drivers and concluded that the drivers were workers. *See Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996) (explaining that an agency must set out the reasoning that leads it from the facts that it has found to the conclusions that it draws from those facts). DCBS agreed with the ALJ's legal analysis.

On review, this court has also applied the law to the facts of this case and concluded that the drivers are workers. Neither the ALJ nor this court relied on Grove's opinion regarding whether the drivers were workers, and each explained the reasoning that led it to conclude that the drivers were workers. Therefore, even assuming, without deciding, that it was error for the ALJ to refuse to strike portions of Grove's testimony, that error has had no effect on the outcome of the case. Grove's opinion that the drivers are workers was not entitled to, and did not receive, any deference from the ALJ, DCBS, or this court.[9]

Affirmed.

---

[9] In its reply brief, petitioner responds to DCBS's assertion that Grove did not rely on the *Cattlemen's* audit file by asserting that Grove "looked at how the auditor in [*Cattlemen's*] calculated the drivers' earnings." The second assignment of error does not relate to the drivers' earnings; instead, petitioner's argument is that Grove "rel[ied] on unproduced documents in *forming his expert opinion that the drivers were 'workers.'*" (Emphasis added.) Because the earnings calculation is not relevant to the assignment of error, we do not consider whether petitioner was prejudiced regarding the earnings calculation.