Argued and submitted August 30, 2016; conviction for unauthorized use of a vehicle reversed, otherwise affirmed January 11, 2017

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JOSEPH RICHARD CIVIL,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1401001; A158212

388 P3d 1185

John Evans, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Robert M. Wilsey, Assistant Attorney General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Haselton, Senior Judge.

## HASELTON, S. J.

Defendant appeals a judgment of conviction of one count of unauthorized use of a vehicle (UUV), ORS 164.135, entered after a bench trial. He asserts that, although he was charged with UUV solely under ORS 164.135(1)(a), the evidence at trial related only to ORS 164.135(1)(c)—and, because of that asymmetry, he was entitled to acquittal.[1] Central to defendant's challenge is his assertion that *State v. Cox*, 96 Or App 473, 772 P2d 1385, *rev den*, 308 Or 315 (1989), in which we construed the scope of ORS 164.135(1)(a), "was wrongly decided and should be overruled." For the reasons that follow, we conclude that our essential reasoning in *Cox* was so fundamentally flawed as to render that holding "plainly wrong." *Accord Farmers Ins. Co. v. Mowry*, 350 Or 686, 697-98, 261 P3d 1 (2011) (addressing considerations pertaining to adherence to *stare decisis* with respect to statutory construction); *State v. Olive*, 259 Or App 104, 107-08, 312 P3d 588 (2013) (applying "plainly wrong" standard with respect to court's precedent construing statute). Accordingly, we reverse.

Defendant's challenge, as raised during closing argument in a trial to the court, was, albeit not explicitly so denominated, in the nature of a motion for judgment of acquittal. *See, e.g., State v. Hawkins*, 280 Or App 26, 29, 380 P3d 979 (2016); *State v. Habibullah*, 278 Or App 239, 242 n 1, 373 P3d 1259 (2016). Consequently, we state the material facts in the light most favorable to the state. *State v. Markwell*, 281 Or App 196, 197, 383 P3d 285 (2016).

In early January 2014, defendant started working as a "driver" for Farm Fresh Foods, which was in the

---

[1] ORS 164.135(1) provides, in part:

"(1) A person commits the crime of unauthorized use of a vehicle when:

"(a) The person takes, operates, exercises control over, rides in or otherwise uses another's vehicle * * * without consent of the owner; [or]

"* * * * *

"(c) Having custody of a vehicle * * * pursuant to an agreement with the owner thereof whereby such vehicle * * * is to be returned to the owner at a specified time, the person knowingly retains or withholds possession thereof without consent of the owner for so lengthy a period beyond the specified time as to render such retention or possession a gross deviation from the agreement."

business of door-to-door meat sales.[2] According to Farm Fresh's local warehouse manager, Talsma, "product is given to drivers on consignment, and * * * they pay a daily truck charge [of $20], like a sublease on the vehicles." Typically, drivers would come to the warehouse in Milwaukie in the morning, inventory would be loaded into freezers in the vehicles (either trucks or vans), and invoices would be issued. Vehicles were scheduled to be returned to the warehouse at the end of the day, between 8:00 and 9:00 p.m.—and, in all events, "no later than 10 [p.m.], and definitely not overnight."

On the morning of April 15, 2014, defendant contacted Talsma about the possibility of working as a driver that day. Another driver, McClure, had just called to tell Talsma that his vehicle had broken down, so Talsma told defendant that he "could work with [McClure] that day." Specifically, Talsma had a vehicle (a van) fully loaded at the Milwaukie warehouse and released the van to defendant with instructions, and on the understanding, that defendant would pick up McClure at his home in Northeast Portland and that he and McClure would work together that day. Defendant was aware that he was to return that van to the warehouse that evening.

Defendant did not, however, pick up McClure, much less work with him in making meat sales that day. Nor did defendant return the van that night. Instead, the van was found abandoned, but undamaged, five days later, in a parking lot in Happy Valley, several miles from the Milwaukie warehouse. Most of the meat inside was spoiled and unsalvageable.

Defendant was charged by indictment with one count of UUV and one count of theft in the second degree, ORS 164.045. The UUV count (Count 1) alleged:

"The defendant, on or about April 15, 2014, in Clackamas County, Oregon, did unlawfully and knowingly

---

[2] Defendant was described in the record, without contradiction, as an "independent contractor." *But see RJ Enterprises LLC of Oregon v. DCBS*, 255 Or App 439, 298 P3d 567, *rev den*, 354 Or 148 (2013) (affirming administrative determination that "drivers" who marketed, sold, and delivered the inventory of a frozen meat and seafood distributor were "subject workers," not independent contractors, for purposes of workers' compensation premium assessment).

take, operate, ride in, and/or exercise control over a vehicle, without the consent of the owner, Farm Fresh Foods."

The operative allegation replicates the applicable text of ORS 164.135(1)(a). *See* 283 Or App at 396 n 1.

The matter was tried to the court. After the submission of the evidence, substantiating the facts recounted above, the prosecutor, in his initial closing argument, summarized the state's theory of "unauthorized use":

"[T]he sole authorization for [defendant] was to use the vehicle to go pick up a coworker. He's driving all over town that day * * * and obviously never returns the vehicle.

"* * * The vehicle's only discovered several days later. His initial use beyond not picking up the coworker was unauthorized, but his unauthorized use continued."

The prosecutor explicitly referred to *Cox*, describing its facts, and concluded:

"I think [the circumstances in *Cox*] are clearly analogous to this. And like I said, I think his use was technically unauthorized the moment he didn't pick up [McClure], but then he continued to go about possession of the vehicle."

Defense counsel, in closing, asserted, *inter alia*, that defendant must be acquitted because the evidence established, at most, unauthorized use under ORS 164.135(1)(*c*) (emphasis added)—which had not been pleaded in the indictment:

"[T]aking the case most favorable to the State, the State has * * * mispled.

"* * * * *

"Subsection (c) is saying, having * * * custody of a vehicle * * * pursuant to an agreement with the owner * * * whereby such vehicle is to be returned to the owner at a specified time, the person knowingly retains or withholds possession thereof without consent of the owner for so lengthy a period beyond the specified time as to render such retention or possession a gross deviation from the agreement.

"* * * * *

"And the State has pled it under (1)(a). So even if this Court does believe that there was some sort of criminal conduct on behalf of [defendant], the charging instrument

doesn't address what subsection that conduct would come under."

Defense counsel concluded by reiterating that subsection (1)(c) was the pertinent provision but that "the State hasn't pled it in that manner." The court then observed, "True. They're stuck with what they pled." Defense counsel did not address *Cox* in closing.

Finally, in rebuttal closing, the prosecutor characterized defendant's contention as "simply a red herring." Instead, he reiterated that "[defendant] clearly used the vehicle or operated it, or exercised control over it without consent of the owner in this case in a number of ways over a number of days."

The court adjourned to "take a look at [the] authorities" and, upon reconvening, noted that it had "read the cases and the [UUV] statute and * * * analyzed the facts in detail." The court then, without further comment, found defendant guilty of UUV.[3]

On appeal, defendant renews his contention that the evidence related only to ORS 164.135(1)(c), and not to ORS 164.135(1)(a), and that, because he had been charged only under the latter, he was entitled to an acquittal.[4] Defendant acknowledges that *Cox* is to the contrary, in that it construed ORS 164.135(1)(a) so broadly as to encompass his conduct, but asserts that our statutory construction analysis there was so deficient that *Cox* must be overruled. In support of that contention, defendant offers a detailed deconstruction of the text, context, and legislative history of ORS 164.135.

The state responds that, although our holding in *Cox* antedated *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993),[5] its analysis anticipated *PGE* and "faithfully reflected the text of ORS 164.135(1)(a) and

---

[3] The court found defendant not guilty of second-degree theft, observing, "I just don't find that there was specific evidence of intent to commit theft of the meat that was in the vehicle."

[4] Defendant also assigns error to one aspect of his sentence. That matter was rendered moot by the trial court's subsequent entry of a corrected judgment, ORS 138.083.

[5] And, of course, *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009).

tracked the stated purpose of [that] provision," including by reference to pertinent commentary. Consequently, the state asserts, defendant has failed to demonstrate that *Cox* was incorrectly decided—much less "plainly wrong," as required for this court to overrule its precedent—and, thus, *Cox* is dispositive.

Before engaging with the parties' contentions regarding the construction of ORS 164.135(1)(a), it is not only useful, but essential, to address two threshold matters. *First*, precisely what *was* the holding in *Cox*? That is, what did *Cox* hold—and *not* hold? *Second*, what types of "unauthorized use" were substantiated in this record? That is, does the record disclose that defendant's use of the van violated the terms of his agreement with the owner beyond the failure to timely return the vehicle, as described in ORS 164.135(1)(c)? The resolution of those two inquires will, in turn, define the relationship of *Cox* to the present dispute—and, even more particularly, inform whether, or to what extent, our statutory construction in *Cox* can be deemed "plainly wrong" as applied to these circumstances.

We turn to *Cox*, with the preface of reiterating the pertinent text of ORS 164.135(1):

"A person commits the crime of unauthorized use of a vehicle when:

"(a)   The person takes, operates, exercises control over, rides in or otherwise uses another's vehicle * * * *without consent of the owner*;

"(b)   Having custody of a vehicle * * * pursuant to an agreement between the person or another and the owner thereof whereby the person or another is to perform for compensation a specific service for the owner involving the maintenance, repair or use of such vehicle, * * * the person intentionally uses or operates it, without consent of the owner, for the person's own purpose in a manner constituting a gross deviation from the agreed purpose; or

"(c)   *Having custody of a vehicle * * * pursuant to an agreement with the owner* thereof whereby such vehicle * * * is to be returned to the owner at a specified time, the person knowingly retains or withholds possession thereof *without consent of the owner* for so lengthy a period beyond

the specified time as to render such retention or possession a gross deviation from the agreement."

(Emphases added.)[6]

In *Cox*, the defendant had worked as an informant for the Eugene police, who were investigating several burglaries, including one in which firearms had been stolen. 96 Or App at 475. As part of that investigation, the police provided the defendant with a car to drive one of the burglary suspects to a meeting with an undercover officer. *Id.* The defendant was told that the car was to be used only in connection with the investigation—and "at no time was [the] defendant given permission to take the car outside Eugene." *Id.* The defendant did, however, "take the car outside Eugene": He drove to Portland, where the car (with the defendant as a passenger) was stopped for speeding. *Id.* at 476.

The defendant was charged with UUV under ORS 164.135(1)(a), with the indictment alleging that the defendant

> "did unlawfully and knowingly, having a [vehicle] rented by the *** Eugene Police Department pursuant to conditions that the defendant could operate the vehicle only in the Eugene, Oregon area and for purposes designated by the Eugene Police Department, did thereafter take the vehicle outside of Eugene and use it beyond the conditions of that agreement, without the consent of the *** Eugene Police Department, the owner of the vehicle[.]"

*Id.* (internal quotation marks omitted). Thus, the unauthorized use charged in *Cox* pertained exclusively to a geographic/spatial deviation from the parties' agreement—and not to temporal deviation within the explicit purview of ORS 164.135(1)(c).[7]

The defendant unsuccessfully demurred, arguing that subsection (1)(a) was inapposite, because, as explicitly alleged in the indictment, he had possession of the car with

---

[6] The present text of ORS 164.135(1) is—except for gender-neutral revisions, *see* Or Laws 2007, ch 71, § 50—identical to the originally enacted text, Or Laws 1971, ch 743, § 134, construed in *Cox*.

[7] The state's brief as respondent in *Cox* acknowledges that the car in that case "was not to be returned to the police by a specific time." Respondent's Brief at 7 n 3, *State v. Cox*, 96 Or App 473, 772 P2d 1385 (1989) (CA A49180) (Respondent's Brief).

the consent of the Eugene Police Department. *Id.* at 475, 477. On appeal, the defendant renewed his contention:

> "[The] Defendant challenges the indictment on the ground that the crime under subsection (1)(a) only occurs when a vehicle is taken without any consent and not when its use merely exceeds the scope of permission, as it did here. He contends that, because subsections (b) and (c) apply to specific situations where consent was initially given and then abused, subsection (a) applies only when possession was obtained illegally. Alternatively, he argues that, even if subsection (a) does apply where permission was initially given and then exceeded[,] the requirement of a 'gross deviation' from the initial consensual use should be implied from subsections (b) and (c)."[8]

*Id.* at 477 (footnote omitted).

---

[8] The defendant in *Cox* advanced that argument on grounds, and in terms, strikingly similar to those urged by defendant here. *See* Appellant's Opening Brief at 9-13, *State v. Cox*, 96 Or App 473, 772 P2d 1385 (1989) (CA A49180) (Appellant's Brief) (referring to statutory context, commentary, and history, including derivation from New York Revised Penal Law § 165.05). For example, the defendant there contended that the state's construction of subsection (1)(a) as "apply[ing] not just to defendants who lack all permission, but also to those whose acts exceed the bounds of the permission given,"

"would render subsections (b) and (c) meaningless and superfluous, for the offenses they describe would necessarily be included within subsection (a). Moreover, it would leave unexplained why the later subsections took care to require a 'gross deviation' from the agreement. By the state's thinking, any deviation would, in the language of subsection (a), be 'without consent' of the owner.

"Indeed, the State's position would make criminal that which otherwise would be only a breach of contract. It might make it a felony for a bailee to exceed the speed limit if the owner had told him to 'drive safely,' or for a bailee to omit to change the oil when the owner had instructed him to perform this task before driving."

The state remonstrated:

"According to [the] defendant, because ORS 164.135(1)(b) and (c) deal with situations where the initial taking is consensual, therefore subsection (1)(a) does not. * * * [T]his is not good logic nor is it what the statute says. ORS 164.135(1)(b) and (c) simply cover two situations which include an initial agreement: an agreement to repair; and an agreement to return a vehicle 'at a specified time.' The statute does not say or imply that any other conceivable use beyond the scope of an initial agreement falls outside the statutory prohibition. Under [the] defendant's reading of the statute, it would not cover someone who takes a car for a test drive, with no specific return time, and is next seen with the car hundreds of miles away. Neither the language, history, nor interpretation of the statute leads to this absurd result."

Respondent's Brief at 7.

Neither brief in *Cox* referred to the discussions and deliberations of the Criminal Law Revision Commission relating to the promulgation of ORS 164.135.

We summarily rejected that challenge. Our analysis and holding reads in its entirety as follows:

> "[The] Defendant's arguments are contrary to the statutory language and legislative history. ORS 164.135(1)(a) states that a crime is committed when a person, without consent, 'takes, operates, exercises control over, rides in *or* otherwise uses another's vehicle \* \* \*.' [The] Defendant's reading of the statute ignores every verb except 'takes.' If the legislature had intended to limit the statute to non-consensual takings when no permission was ever given, it would not have used the other, more inclusive verbs. The commentary to the statute confirms this:

> "'This section covers the "joy-riding" type of offense where the actor makes unauthorized use of another's vehicle but without the intent to steal it or permanently deprive the owner of its use. The purpose of the language, "takes, operates, exercises control over, rides in or otherwise uses," is to prohibit not only the taking or driving of another's vehicle without permission but, also, to prohibit *any* unauthorized use of the vehicle.' Commentary to Oregon Criminal Code of 1971, 177 (1975 ed)."

*Id.* at 478 (first emphasis added in *Cox*; second emphasis original to quoted Criminal Code commentary).[9]

In so holding, we did not address either the contextual relationship between subsections (1)(b) and (c) and subsection (1)(a) or the balance of the pertinent Criminal Code commentary (discussed below, *see* 283 Or App at 408-10). Nor did our opinion engage with the defendant's contentions that to construe subsection (1)(a) so broadly as the state urged would render criminal even minimal (non-"gross") deviations from agreed use. *See* 283 Or App at 402 n 8.

Still—and contrary to the present parties' apparent shared understanding—*Cox* did *not* hold that subsection (1)(a) encompasses *temporal* deviations from agreed use and, thus, subsumes the circumstances described in subsection (1)(c). As noted above, the deviation from agreed use charged, and at issue, in *Cox* was geographic/spatial, not temporal. Accordingly, we had no occasion to consider

---

[9] *See* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 134, 142 (July 1970) (Commentary).

whether, much less hold that, subsection (1)(a) applies to circumstances in which a person has custody of a vehicle pursuant to an agreement with the owner but fails to return the vehicle within the time specified in their agreement.

Further, to so construe subsection (1)(a)—rendering subsection (1)(c)[10] substantively and functionally superfluous—would violate fundamental, statutorily prescribed principles of construction. *See* ORS 174.010 ("In the construction of a statute * * * where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."); ORS 174.020(2) ("When a general and particular provision are inconsistent, the latter is paramount to the former so that a particular intent controls a greater intent that is inconsistent with the particular intent."); *accord State v. Stamper*, 197 Or App 413, 418, 106 P3d 172, *rev den*, 339 Or 230 (2005) ("[W]e assume that the legislature did not intend any portion of its enactments to be meaningless surplusage."); *State v. Guzek*, 322 Or 245, 268, 906 P2d 272 (1995) ("[W]hen one statute deals with a subject in general terms and another deals with the same subject in a more minute and definite way, the two should be read together and harmonized, if possible, while giving effect to a consistent legislative policy.").[11]

In sum, in cases of deviation from authorized use in which the only deviation proved is temporal—that is, retention or withholding of possession beyond the "specified time"—ORS 164.135(1)(c) controls exclusively, and ORS 164.135(1)(a) is inapposite. In such circumstances, a defendant charged under ORS 164.135(1)(a) would be entitled to a judgment of acquittal. *See, e.g., State v. Medina*, 357 Or 254, 267, 355 P3d 108 (2015) ("The state is limited to the substantive allegations in the indictment.").

---

[10] And, by parity of reasoning, subsection (1)(b).

[11] *See also Smith v. Board of Parole*, 268 Or App 457, 465-66, 343 P3d 245, *rev den*, 357 Or 550 (2015) (noting that, if one statute were construed as "embod[ying] an omnibus entitlement to subpoena witnesses" in all proceedings before the board, such a construction would render explicit statutory provision for such authority with respect to parole revocation proceeds "superfluous"); *Filipetti v. Dept. of Fish and Wildlife*, 224 Or App 122, 129, 197 P3d 535 (2008) (noting that, "if plaintiffs' proposed construction were correct, then [statutory language] would be meaningless—or, at least, gratuitous").

That construction implicates, in turn, the second of the two threshold inquiries framed above: What type, or types, of deviation from agreed use did the state's proof substantiate? If that proof pertained solely to a temporal deviation, then, however "gross" that deviation, defendant would be correct that, by charging him solely under ORS 164.135(1)(a), the state "mispled"—and, because, as the trial court observed, the state was "stuck with what they pled," *see* 283 Or App at 399, he would be entitled to a judgment of acquittal. If, however, the state's proof substantiated deviation from agreed use other than, or in addition to, temporal deviation, then, *assuming adherence to Cox*, the nontemporal deviation would be culpable under subsection (1)(a), and the denial of the motion for judgment of acquittal must be affirmed because there was some evidence establishing guilt under that provision, as charged.[12]

To be sure, the state did present evidence of defendant's temporal deviation from the agreed-upon time for returning the meat delivery van: Defendant was to return it to the Milwaukie warehouse that evening, but never did so. *See* 283 Or App at 397. But that was not the state's only proof. Rather, the state also presented evidence that defendant deviated from the agreed use of the vehicle by failing to use the van to pick up McClure, the other driver, and to engage in joint sales activities with McClure, using the van. *Id.*

With that understanding of the evidence at trial and our deconstruction above of *Cox*'s holding, the dispositive issue here is crystallized: Assuming adherence to *Cox*, defendant's nontemporal deviations from agreed use were legally sufficient to support a conviction under ORS 164.135(1)(a). That conclusion is patent—unless, as defendant urges, we

---

[12] We emphasize in this context that defendant's assignment of error is that "the trial court erred when it failed to acquit defendant of the charge of UUV." Defendant did not object at trial to the state's presentation of evidence pertaining to temporal deviation as being immaterial given the allegations of the indictment. Nor did defendant move to strike such evidence. Consequently, no claim of *evidentiary* error was raised and preserved.

We note further that, in rendering its verdict, the trial court did not elaborate on the factual basis of that verdict—that is, whether it was based on the state's proof of temporal deviation, proof of other, nontemporal deviations from the agreed use, or both. *See* 283 Or App at 399.

overrule *Cox*. We can do so only if we conclude that *Cox* was "plainly wrong," a rigorous standard grounded in presumptive fidelity to *stare decisis*. Thus: Were we "plainly wrong" in *Cox* in holding that, in circumstances in which a person has possession of a vehicle pursuant to an agreement, deviations in use from that agreement (other than those explicitly addressed in ORS 164.135(1)(b) and (c)) are culpable under ORS 164.135(1)(a)?

Whatever the ultimate meaning of "plainly wrong,"[13] to be "plainly wrong" a holding must first be wrong. As a practical matter, that requires at least some (re)examination of the dispositive substantive issue and our precedent's consideration of that issue, so that we can appreciate the reasoning that led us to the earlier conclusion.[14] To be sure, it may be tempting in some cases to conclude without further inquiry that, given the apparent character and quality of our precedent's published reasoning, it cannot (regardless of its ultimate correctness) be deemed to have been *plainly* wrong. Nevertheless, that assessment cannot be made, especially in the context of statutory construction, without an appreciation of what we did *not* address. *See Assoc. Unit Owners of Timbercrest Condo v. Warren*, 352 Or 583, 598, 288 P3d 958 (2012) (in context of reconsidering prior statutory construction, noting that, while the "stability and predictability" that result from *stare decisis* are prudentially "important values," "[a]t the same time, [the] court has an obligation to reach what we regard as a correct interpretation of statutes and rules"); *see also Olive*, 259 Or App at 109-13 (engaging in such a comprehensive reexamination).

We return to *Cox*. As noted, our analysis there was, in some respects, consistent with the template described in

---

[13] We grapple with that question below. *See* 283 Or App at 415-19.

[14] *Cf. State v. Smith*, 277 Or App 709, 716-17, 372 P3d 549, *rev den*, 360 Or 423 (2016) (noting with reference to "plain error" standard for putative review of unpreserved claims of error, that "consideration of the propriety of plain error review" and consideration of the merits are "innately intertwined," because "it is, after all, impossible to assess whether a proposition is beyond reasonable dispute without at least some evaluation of its merits"); *State v. Washington*, 265 Or App 532, 540, 335 P3d 877 (2014) (concluding that the holding in *State v. Brody*, 69 Or App 469, 473, 686 P2d 451 (1984), did not "surviv[e] the Supreme Court's decision" in *State v. Owens*, 302 Or 196, 729 P2d 524 (1986)).

*PGE* and *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), in that it emphasized the text of ORS 164.135(1)(a) and referred, by way of legislative history, to one paragraph of the commentary to the 1971 Criminal Code revisions that pertained to subsection (1)(a). *See* 283 Or App at 403.

Nevertheless, our published analysis in *Cox* was materially incomplete with respect to three fundamental considerations later prescribed in *PGE*, as amplified in *Gaines*. First, we did not address the content and function of subsection (1)(a) in the context of the whole statute, including, specifically, subsections (1)(b) and (c). Indeed, we failed to do so notwithstanding that the defendant in *Cox* had advanced substantial arguments predicated on such contextual consideration. *See* 283 Or App at 402 n 8. Second, and concomitantly, while, as noted, our opinion in *Cox* quoted a single paragraph of the Criminal Code commentary relating to subsection (1)(a), it did not acknowledge and engage with the balance of the commentary, including its description of the derivation and function of subsections (1)(b) and (c), which the defendant in *Cox* explicitly invoked along with the commentary to the predicate New York statute.[15] Third, there is no suggestion in *Cox* that we had referred to, and considered, the Criminal Law Revision Commission's discussions and deliberations pertaining to the promulgation of ORS 164.135. We address each in turn.

As we emphasized in *Cox*, subsection (1)(a) is phrased broadly as proscribing a range of conduct ("takes, operates, exercises control over, rides in or otherwise uses" a vehicle) "without consent of the owner." In contextual contrast, subsections (1)(b) and (1)(c) pertain to particular circumstances in which the person has "custody of a vehicle * * * *pursuant to an agreement with the owner*" (emphasis added) and then, without the owner's consent, engages in specific conduct in violation of that agreement. Further, while the latter two subsections prescribe a "gross deviation" condition of culpability for conduct within the purview of those provisions, subsection (1)(a) includes no such qualification. In *Cox*, we did not address the contextual significance of those patent differences.

---

[15] *See* Appellant's Brief at 10, 12.

*Cox*'s failure to address context is problematic, not because consideration of text in context would, by itself, be dispositive in this case. It would not be—far from it. Rather, consideration of statutory context in its entirety discloses a fundamental ambiguity that would not otherwise be apparent from the text of subsection (1)(a) viewed in isolation: Does subsection (1)(a) represent an omnibus proscription of all unauthorized use, including deviation from use pursuant to an agreement, subject only to exceptions for those circumstances described in subsections (1)(b) and (1)(c)? Or does subsection (1)(a) pertain only to unauthorized use in circumstances in which the owner has *never* consented/agreed to the defendant's possession of the vehicle, with subsections (1)(b) and (1)(c) describing the only circumstances in which deviations from agreed use are deemed criminal—and then, only if the deviation is a "gross deviation"?

Either construction is defensible as linguistically plausible. One might reasonably wonder why—as a matter of structure and syntax—if the legislature intended subsections (1)(b) and (1)(c) to function as qualified exceptions to an omnibus prohibition in subsection (1)(a), it did not include standard "except as provided in" or "subject to" language in subsection (1)(a). Still, such ruminations are just that— raising, rather than resolving, questions as to controlling legislative intent, questions that inhere in the contextual ambiguity that we did not acknowledge in *Cox.*

Those portions of the commentary to the 1971 Criminal Code revisions that we did not address in *Cox* provide some insight. As noted (and quoted) above, *see* 283 Or App at 403, our discussion in *Cox* highlighted a single phrase emphasized in the commentary's description that "[t]he purpose of" the language employed in subsection (1)(a) was "to prohibit not only the taking or driving of another's vehicle without permission but, also, to prohibit *any* unauthorized use of the vehicle." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 134, 142 (July 1970) (emphasis in original). That single, originally emphasized "*any* unauthorized use" was central to our construction. *Cox*, 96 Or App at 478.

The balance to the operative commentary first includes a description of "Derivation," which reads as follows:

"Subsection (1)(a) is adapted from Model Penal Code § 223.9 and New York Revised Penal Law § 165.05.

"Subsections (1)(b) and (c) are taken from New York § 165.05, and define offenses that sound of embezzlement, wherein the defendant originally obtains possession or custody legally, but then misuses or withholds the vehicle wrongfully. Subsection (1)(b) would cover the case of a mechanic who unauthorizedly takes a customer's car and uses it for a personal trip. The type of situation that illustrates (c) would be that of a gratuitous bailment in which a person borrows another's car in Oregon for a few hours and then drives it to another state, keeping it there for several months. In each type of case, the conduct must be a 'gross deviation' from the agreed purpose of the bailment."

Commentary at § 134, 142. The commentary also included a statement of "Relationship to Existing Law," which, as pertinent here, stated:

"The section is meant to include the kinds of acts covered by [*former*] ORS 164.670 [(1969)], the existing 'joy-riding' statute, as well as conduct such as manipulating, starting or tampering with motor vehicles ([*former*] ORS 164.650 [(1969)], [*former*] ORS 164.660 [(1969)]). Damaging a vehicle would be covered by the sections on criminal mischief."[16]

*Id.*

Thus, ORS 164.135(1)(a) and subsections (1)(b) and (c) were derived from different sources. Subsection (1)(a) was derived with substantial modification from both the Model Penal Code section 223.9[17] and New York Revised Penal Law section 165.05,[18] while subsections (1)(b) and (1)(c) were

---

[16] All of those statutes were repealed by Oregon Laws 1971, chapter 743, section 432.

[17] Section 223.9 of the Model Penal Code provides, as it did in 1971:

"A person commits a misdemeanor if he operates another's automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle without consent of the owner. It is an affirmative defense to prosecution under this Section that the actor reasonably believed that the owner would have consented to the operation had he known of it."

[18] New York Revised Penal Law Section 165.05 (1971) provided:

"A person is guilty of unauthorized use of a vehicle when:

derived exclusively from—indeed, lifted verbatim from—the New York statute.

Significantly, the preexisting commentary to the New York statute from which subsections (1)(b) and (1)(c) were derived is explicit that the New York analogs to those subsections, New York Revised Penal Law section 223.9(2) and (3), described the *only* circumstances in which deviations from agreed use are deemed to be criminally culpable:

> "Subdivisions 2 and 3 define offenses of the embezzlement genus, involving excessive misuse or withholding of a vehicle by a person who originally obtained possession or custody thereof legally. In order to exclude frivolous charges, this type of offense has been limited to two kinds of situations [*viz.*, the repair shop/garage deviation and temporal deviation]. * * * In each type of case, the conduct must constitute a 'gross deviation' from the agreement or the agreed purpose of the bailment."

Staff Notes of the Commission on Revision of the Penal Law, Proposed New York Penal Law 355-56 (1964).[19] The Criminal Law Revision Commission was explicitly apprised of the New York commentary in addressing the scope of subsections (1)(b) and (c). Minutes, Criminal Law Revision Commission, July 19, 1968, 3 (Commission Minutes); Tape Recording, Criminal Law Revision Commission, July 19,

---

"1. Knowing that he does not have the consent of the owner, he takes, operates, exercises control over, rides in or otherwise uses a vehicle. A person who engages in any such conduct without the consent of the owner is presumed to know that he does not have such consent; or

"2. Having custody of a vehicle pursuant to an agreement between himself or another and the owner thereof whereby he or another is to perform for compensation a specific service for the owner involving the maintenance, repair or use of the vehicle, he intentionally uses or operates the same, without consent of the owner, for his own purposes in a manner constituting a gross deviation from the agreed purpose; or

"3. Having custody of a vehicle pursuant to an agreement with the owner thereof whereby such vehicle is to be returned to the owner at a specified time, he intentionally retains or withholds possession thereof, without consent of the owner, for so lengthy a period beyond the specified time as to render such retention or possession a gross deviation from the agreement."

[19] There appear to be no reported New York decisions before (or, for that matter, after) the enactment of ORS 164.135 applying New York's UUV statute to deviations from agreed use other than in the circumstances specified in the antecedent analogs of subsections (1)(b) and (c).

1968, Tape 9, Side A (Commission Tape) (colloquy between Sen John Burns and Project Director Donald Paillette).

As set out above, the Criminal Code commentary, paralleling the commentary to the New York statute, describes subsections (1)(b) and (c) as "defin[ing] offenses that sound in embezzlement, wherein *the defendant originally obtains possession or custody legally, but then misuses or withholds the vehicle wrongfully.*" (Emphasis added.) That description conforms with contemporaneous Oregon definitions of "embezzlement," including the then-extant (but soon to be repealed) crime of "embezzlement by bailee," *former* ORS 165.010 (1969), *repealed by* Or Laws 1971, ch 743, § 432. *See Medina*, 357 Or at 269 ("In embezzlement, a defendant is lawfully in possession of property but fraudulently converts it to the defendant's own use."). Conversely, nothing in the commentary suggests that subsection (1)(a) was intended to encompass such "embezzlement"-related conduct; rather, the only such references pertain to subsections (1)(b) and (c).

Still, the commentary's emphasized reference to "*any* unauthorized use of the vehicle" remains. In *Cox*, we invoked that language in support of our reasoning that, "[i]f the legislature had intended to limit [subsection (1)(a)] to nonconsensual takings when no permission was ever given," it would not have employed "other, more inclusive verbs," *viz.*, "operates, exercises control over, rides in or otherwise uses another's vehicle." 96 Or App at 478. However, the commentary itself, in language not quoted in *Cox* but set out above, 283 Or App at 409, gives contextual content to subsection (1)(a)'s use of those "more inclusive verbs," as well as, concomitantly, the significance of that emphasized "*any*":

> "The section is meant to include the kinds of acts covered by * * * the existing 'joy-riding' statute, as well as conduct such as manipulating, starting or tampering with motor vehicles * * *."

Commentary at § 134, 142.

In *State v. Douthitt*, 33 Or App 333, 335-37, 576 P2d 1262 (1978), an *en banc* decision not referred to in *Cox*, we relied on that commentary in addressing the scope of the prohibition of ORS 164.135(1)(a)—and, specifically, whether the defendant, who had burgled a vehicle, had "exercise[d]

control" over the vehicle for purposes of UUV. The majority concluded that mere unauthorized entry was insufficient: "[T]he new statute requires that the actor manifest an intent to deprive the rightful possessor of possession or to otherwise interfere with the rightful possessor's use of the vehicle, but simply does not cover a naked trespass to the vehicle." *Id.* at 338.[20] The dissent remonstrated that, given the emphasized *"any"* in the commentary, "exercises control over" should be broadly construed "to cover not only the actual operation of a vehicle without the owner's consent, but also all those acts leading up to or following the actual operation of the vehicle, including the entry of the vehicle." *Id.* at 339 (Johnson, J., dissenting).[21]

Significantly for our purposes, both the majority and the dissent in *Douthitt* proceeded from the common premise that the meaning of subsection (1)(a) must be ascertained by reference to the antecedent Oregon unauthorized use statutes, referenced in the commentary, which ORS 164.135(1)(a) superseded and from which those provisions were substantially derived. None of those statutes—*viz., former* ORS 164.650 (1969), *former* ORS 164.660 (1969), and *former* ORS 164.670 (1969)—addressed circumstances in which a person had possession of a vehicle under an agreement with the owner.[22]

---

[20] In so holding, the majority concluded that, although ORS 164.135(1)(a) encompassed much of the conduct proscribed by *former* ORS 164.650 (1969), *repealed by* Or Laws 1971, ch 743, § 432, (*e.g.*, "attempts to manipulate any of the levers * * * or sets the vehicle in motion"), it did not incorporate that statute's prohibition against "climbing on or into" a vehicle without the owner's permission. *Douthitt*, 33 Or App at 336 n 4, 338.

[21] *Accord State v. Howell*, 183 Or App 360, 363-66, 51 P3d 706 (2002) (affirming UUV conviction under ORS 164.135(1)(a), where the defendant was found sleeping in a car parked in a residential garage, with "the title to the car in his pocket and spare keys to the car in his lap"; that evidence was sufficient to support a finding that the defendant "intended to deprive the rightful possessor of possession of the vehicle" (internal quotation marks omitted)); *see also State v. Macomber*, 16 Or App 54, 56-58, 517 P2d 344 (1973), *rev'd on other grounds*, 269 Or 58, 523 P2d 560 (1974) ("[E]xercise of control is not limited to a moving vehicle, for otherwise it would be largely synonymous with 'operates' or covered by 'riding.'" (Internal quotations marks omitted.)).

[22] *E.g., former* ORS 164.660 ("[a]ny person who * * * against the will of another or without the consent of the owner of any motor vehicle * * * willfully breaks, injures, or tampers with or removes any part of such vehicle"). The full texts of those former statutes are set out in *Douthitt*, 33 Or App at 36-37 nn 4-6.

In sum, and contrary to our assumption in *Cox*, the statute's comprehensive identification of the *types* of conduct constituting culpable UUV, and the commentary's corresponding emphasized *"any* unauthorized use" language, do not speak to a legislative intention that subsection (1)(a) encompass circumstances in which a person has possession of a vehicle under an agreement with the owner but deviates from that agreement. Rather, it appears that subsection (1)(a) was intended to substantially subsume the prohibitions of the statutory antecedents identified in the commentary, which did not pertain to "embezzlement" of vehicles. Conversely, subsections (1)(b) and (c)—and those provisions alone—define culpability for deviation from agreed use.

We turn, finally, to the legislative history not addressed in *Cox*. The Criminal Law Revision Commission twice considered the substance of the proposed UUV statute—first, in a subcommittee hearing on April 6, 1968, and later in a work session of the full Commission on July 19, 1968. *See* Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, 12-14 (Subcommittee Minutes); Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, Tape 11, Side 2, and Tape 12, Side 1 (Subcommittee Tape); Commission Minutes at 2-3; Commission Tape 9, Side A. The subcommittee discussion was general, confirming the understanding that subsection (1)(a) not only subsumed the then-extant "taking and using" statute (*former* ORS 164.670 (1969)), but also prohibited such other conduct as "tampering" addressed in, *e.g., former* ORS 164.060 (1969). Subcommittee Minutes, Apr 6, 1968, 12; Subcommittee Tape 11, Side 2 (comments of Project Director Donald Paillette).

In contrast, the full Commission focused on the proposed, and ultimately adopted and enacted subsection (1)(c). Much of that discussion pertained to the meaning of "gross deviation" and to the distinctions between (a) non-"gross" (and, hence, nonculpable) failure to return a vehicle within the agreed time; (b) "gross deviation" constituting UUV; and (c) retention of the vehicle for so long a time as to transcend "gross deviation," thus constituting larceny and not UUV. *See* Commission Minutes, July 19, 1968, at 2-3;

Commission Tape 9, Side A.[23] In the course of that discussion, Commission members expressed concerns about the prosecutorial discretion under subsection (1)(c), given the ambiguity of "gross deviation," and the need to be circumspect about criminalizing conduct that had previously been only civilly actionable. *See, e.g.*, Commission Tape 9, Side A (comments of Frank Knight: "We ought to be cautious about making certain kinds of conduct that are not now crimes crimes—on the general theory that one of the things we're trying to do is simplify, rather than create a whole batch of new crimes.").

At no point during its discussions and deliberations did the Commission even allude to the possibility that, in circumstances in which possession was pursuant to an agreement, deviations from agreed use could be culpable under subsection (1)(a). Given the expressed concerns about substantially expanding criminal liability under subsection (1)(c) even with a "gross deviation" qualification, the lack of any such discussion is, at least, striking. Indeed, the tenor of the Commission's discussions about subsection (1)(c) is such that, if subsection (1)(a) had been understood to sweep so broadly as to criminalize all deviations from agreed use, beyond those addressed in subsections (1)(b) and (c)—much less to do so without any "gross deviation" qualification—that matter would have elicited substantial discussion. For example, in that event, one might reasonably have expected some discussion as to why the "gross deviation" qualification applied only to the "garage/repair shop" and "temporal" deviations, but no others. In that event, given the totality of the Commission's considerations, one would reasonably have expected comments and questions along the lines of "So, if I give my teenage daughter permission to use the family car to drive to school and back, but, instead, she goes to a friend's house, is she liable for a Class C felony?" But there were none.[24]

---

[23] As noted above, 283 Or App at 410-11, Commission members were apprised of the pertinent New York commentary.

[24] To be sure, as a general matter, "[i]nferring legislative intent on the basis of a lack of comment in the legislative history" can be "problematic." *Wyers v. American Medical Response Northwest, Inc.*, 360 Or 211, 226-27, 377 P3d 570 (2016). Nevertheless, that assessment is, necessarily, case specific. Here, given the tone and totality of the Commission's discussion, an objectively reasonable

To recapitulate: *Cox*'s published consideration of the statutory text in context was, at least, incomplete, and it did not address significant aspects of the operative commentary or any of the Criminal Law Revision Commission's predicate discussions. Given the totality of the foregoing and the dictates of *PGE* and *Gaines*, if we were deciding *Cox* today, in the first instance, we would decide it differently and hold that ORS 164.135(1)(a) does not apply to circumstances in which a person who is in possession of a vehicle pursuant to an agreement with the owner deviates from the agreed use.

Mere disagreement, however, is not—and cannot be—a sufficient justification for overruling precedent. Rather, the prudential principles that undergird *stare decisis*, as well as practical institutional considerations, require more. Much more. As the Supreme Court explained in *Mowry*:

> "[S]*tare decisis* is a prudential doctrine that is defined by the competing needs for stability and flexibility in Oregon law. Stability and predictability are important values in the law; individuals and institutions act in reliance on this court's decisions, and to frustrate reasonable expectations based on prior decisions creates the potential for uncertainty and unfairness. Moreover, lower courts depend on consistency in this court's decisions in deciding the myriad cases that come before them. Few legal principles are so central to our tradition as the concept that courts should treat like cases alike, and *stare decisis* is one means of advancing that goal. For those reasons, we begin with the assumption that issues considered in our prior cases are correctly decided, and the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent. We will not depart from established precedent simply because the personal policy preferences of members of the court may differ from those of our predecessors who decided the earlier case."

"listener" would ascribe significance to that silence. *Accord Worldmark v. Dept. of Rev.*, 20 OTR 149, 155 (2010) (where "[n]othing in the legislative history supports the inference or conclusion that the legislature was embarking on a major change," "[t]his absence of evidence, this 'dog that did not bark,' is of significance" in construing amended statute).

350 Or at 697-98 (internal citations and footnote omitted). *Accord State v. Moore*, 247 Or App 39, 46, 269 P3d 72 (2011), *rev'd on other grounds*, 354 Or 493, 318 P3d 1133 (2013), *adh'd to as modified on recons*, 354 Or 835, 322 P3d 486 (2014) (noting that, in some circumstances, to revisit and repudiate precedent can "subvert public confidence in the integrity of our processes—the ultimate source of any court's authority").

Nor are we oblivious to the hard practical reality that a relatively permissive "culture of reconsideration" can substantially exacerbate burdens of an appellate court, perhaps especially an intermediate appellate court:

> "[T]he labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him."

Benjamin N. Cardozo, *The Nature of the Judicial Process* 149 (1921).

Thus: the "plainly wrong" requirement. Nevertheless—and self-evidently—the mere existence of that standard manifests that our adherence to precedent is presumptive, not absolute. While we must not, and do not, "lightly overrule" our precedents, including those construing statutes, *Aguilar v. Washington County*, 201 Or App 640, 648, 120 P3d 514 (2005), *rev den*, 340 Or 34 (2006), we also recognize that, as instructed in *Warren*, 352 Or at 598, "[a]t the same time, this court has an obligation to reach what we regard as a correct interpretation of statutes and rules."

Such revisiting of statutory construction precedent, while necessarily quite rare, usually occurs when our precedent cannot be reconciled with the result that would follow application of a prescribed (or subsequently prescribed) mode of analysis or when we are presented with a qualitatively new, potentially dispositive contention not previously raised and addressed. *See, e.g., Olive*, 259 Or App at 109-13 (overruling 1984 decision construing ORS 162.315 (defining crime of resisting arrest), reasoning that our precedent, which antedated *PGE*, "did not adequately analyze" the statute); *Hostetter v. Board of Parole and Post-Prison*

*Supervision*, 255 Or App 328, 333-38, 296 P3d 664, *rev den*, 353 Or 747 (2013) (reconsidering prior construction of administrative rule where, in the prior case, court had not been presented with contention that the petitioner advanced and had not adhered to usual framework for decision of the controlling issue); *accord Warren*, 352 Or at 598 ("Particularly when we 'failed to apply our usual framework for decision or adequately analyze the controlling issue,' we must be open to reconsidering earlier case law." (Quoting *Mowry*, 350 Or at 698.)).[25]

In some respects, this case is a paradigmatic vehicle for adherence to *stare decisis* based on considerations of systemic "[s]tability and predictability" so cogently described in *Mowry*, 350 Or at 697. This is not a case in which new arguments are being presented for the first time; rather, as noted above, defendant's essential contentions here were advanced in the briefing in *Cox*. *See* 283 Or App at 402 n 8. Further, although the analysis in *Cox* was incomplete, it did address, at least in part, the statutory text and related commentary. *See generally Mastriano v. Board of Parole*, 342 Or 684, 692, 159 P3d 1151 (2007) ("The absence of a *PGE*-style examination of legislative intent does not deprive a prior statutory interpretation of its ordinary effect as a precedent.").

We uniquely appreciate the demands of this work and that almost any appellate decision, especially when deconstructed a generation later, can be deemed "incomplete" or otherwise wanting. Consequently, due regard for *stare decisis* and our predecessors' collegial commitment demands that "plainly wrong" be a rigorous standard, satisfied only in exceptional circumstances.

This is such an exceptional case. The deficiencies in *Cox* are fundamental, essential, far transcending pointillistic exegesis or second-guessing. Rather, those deficiencies are apparent with even a basic exploration of the text

---

[25] *See also State v. Hunt*, 270 Or App 206, 212, 346 P3d 1285 (2015) (analysis in intervening Supreme Court decision "does not suggest that our interpretation [of the statute in the precedent], which scrutinized the text and context of that statute, was 'plainly wrong'"); *State v. Simonov*, 269 Or App 735, 743, 346 P3d 589 (2015), *aff'd*, 358 Or 531, 368 P3d 11 (2016) (adhering to statutory construction precedent where state, as appellant, failed to "demonstrate that our prior statutory construction is plainly wrong").

and context of the statute, let alone its legislative history. Indeed, we respectfully submit that reasoned consideration of the totality of circumstances properly bearing on the construction of ORS 164.135(1)(a) permits only one conclusion: *Cox* was "plainly wrong," and we overrule that decision.

That holding, in turn, compels reversal of defendant's UUV conviction. As explained above, the state's proof pertained both to a temporal deviation from the agreed use and to other, nontemporal deviations from agreed use. The former is actionable only under ORS 164.135(1)(c) and not (as charged) under ORS 164.135(1)(a), and the latter is not actionable under ORS 164.135, including ORS 164.135(1)(a). Accordingly, the state failed to prove UUV as charged.

Conviction for unauthorized use of a vehicle reversed; otherwise affirmed.